Argued and submitted May 26, 1999, conviction affirmed; sentence vacated; remanded for resentencing January 26, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## CLIFFORD SCOTT ALLRED,
*Appellant.*

(98CR1564FE; CA A103666)

995 P2d 1210

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Jonathan H. Fussner, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

Brewer, J., dissenting.

## LINDER, J.

Defendant appeals his sentence for hindering prosecution. The sole issue on appeal is whether the trial court erred in imposing a 36-month durational departure sentence. We conclude that the trial court erroneously interpreted and applied OAR 213-008-0002(1)(b)(J), the particular sentencing guideline on which the court relied in imposing defendant's sentence. Consequently, we vacate the sentence for hindering prosecution and remand for resentencing.

Defendant pleaded guilty in connection with hindering the prosecution of Jesse Fanus, an individual who was suspected of murder. Defendant is a long-time friend of Fanus's father and has known Fanus since he was an infant. Fanus was a fugitive from the police and a suspect in the murder of retired Marine Corps General Marion Carl and in the shooting of Carl's wife in the course of a home invasion robbery. On June 29, 1998, defendant was driving through Roseburg and by chance saw Fanus on the street at a time that Fanus was in the vicinity of police officers, but apparently was not noticed by them. Defendant stopped his car, told Fanus he should get in, and drove him to Medford. Defendant did not know if Fanus had committed the crime. He suspected Fanus might have done so, however, because he knew that Fanus and Fanus's brother had acquired a shotgun and he was concerned that they would get themselves into trouble with it. En route to Medford, Fanus told defendant that he had shot Carl with a shotgun and that he had disposed of the weapon. Defendant suggested that Fanus go to Los Angeles because it is a big city where "a person could get lost." Once in Medford, defendant provided Fanus with some clothing and put him on a bus to California. One week later, California police arrested Fanus in suburban Los Angeles. While Fanus was on the run, defendant did not disclose Fanus's whereabouts to anyone. When the police questioned defendant after apprehending Fanus, defendant initially denied any knowledge of the matter. He admitted his involvement only after learning that Fanus had told police that defendant had driven him to Medford.

Defendant was charged with and convicted of hindering prosecution. ORS 162.325.[1] The sentencing court imposed an upward durational departure of 36 months' imprisonment from the presumptive sentence of 15 to 18 months. In departing, the trial court relied on OAR 213-008-0002(1)(b)(J) (Factor J), which authorizes an upward departure if "[t]he degree of harm or loss attributed to the current crime of conviction was significantly greater than typical for such an offense."

In arguing for a durational departure under Factor J, the state pointed to four facts or circumstances justifying the departure. First, the state urged that the crime committed by Fanus—aggravated murder—was a more serious felony offense than others that would support a hindering prosecution charge. Next, the state emphasized that defendant did not just provide Fanus with a ride away from the crime scene, but he took Fanus out of the county and "out of the net" where he might have been caught earlier. Third, the state contended that Fanus posed a graver risk to public safety than typically might be the case because he was an aggravated murder suspect and, according to the information available to police, he possessed a firearm. Finally, the state observed that, due to defendant's offense, the search was expanded from a local to a state-wide search and finally to a national search that involved California and federal law enforcement authorities.

■■    The trial court relied only on the third concern cited by the state—that is, the risk to the public created by the possibility that Fanus, while at large, would commit another murder:

---

[1] ORS 162.325 provides, in part:

"(1) A person commits the crime of hindering prosecution if, with intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony, * * * the person:

"* * * * *

"(c) Provides or aids in providing such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension; * * *

"* * * * *

"(2) Hindering prosecution is a Class C felony."

"[Y]ou were giving [Fanus] a second breath to go down and potentially commit a similar crime or the same type of crime, and so you did put the public at great risk and you simply didn't need to do it.

"So I think that the harm or loss caused by your actions were significantly greater than typical and that there will be a durational departure to 36 months * * *."

Defendant challenges the trial court's departure under Factor J, arguing that Factor J authorizes a departure only if defendant's crime *actually* caused harm significantly greater than typical for that crime, not if it only *created a risk* of such harm. The state responds that a risk of harm to the public, in the form of the potential for Fanus to commit more crimes, satisfies the language of the relevant departure factor. So framed, the issue turns on the meaning of the relevant sentencing guideline (Factor J), which presents us with a legal question that we decide without deference to its resolution below. *See State v. Lark*, 316 Or 317, 322, 851 P2d 1114 (1993).

■ The starting point for interpreting the guideline is, of course, its plain language. Factor J authorizes a departure if "[t]he degree of harm or loss *attributed* to the current crime of conviction *was* significantly greater than typical for such an offense." (Emphasis added.) The text is phrased in the past tense. The guideline refers to a degree of harm or loss "attributed" to the current crime of conviction. It further refers to whether the harm or loss "was" significantly greater than typical for the crime. In that respect, the terms have a distinctly retrospective and completed-act focus. The same is true of the provision's surrounding context. The other aggravating factors contained in the same rule are all directed to actual and completed harms that are a consequence of the crime committed, not to risk of harm in the form of prospective and theoretical future crimes.[2] It may be that the legislature, had it considered the possibility, would have chosen to

---

[2] Other aggravating factors in the same administrative rule include that the crime involved deliberate cruelty to the victim; knowledge of a victim's particular vulnerability; use of a weapon; a violation of public trust or responsibility; multiple victims; permanent injury to the victim; and a discriminatory animus in targeting a particular victim. *See generally* OAR 213-008-0002(1)(b).

encompass risk of future harms in the equation.[3] But, unlike other statutes and guidelines where the legislature expressly has referred to future or potential dangerousness, it plainly did not do so here. *Compare* ORS 163.150(1)(b)(B) (death sentence for aggravated murder authorized where "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"); OAR 213-008-0002(1)(b)(B) (departure sentence for person crime involving vulnerable victim authorized if the crime involved increased harm or "threat of harm"); OAR 213-008-0002(1)(b)(C) (same if person crime involving vulnerable victim involved "threat of or actual violence").[4]

■ Moreover, Factor J refers to harm that is greater in "degree" than is typical for a particular crime. That language suggests quantitatively greater harm, not harm different in kind.[5] A risk to public safety—which is the harm that the sentencing court identified—is not the harm that the crime of hindering prosecution seeks to prevent.

Hindering prosecution is a descendant of the common-law crime of accessory after the fact, which was an offense based on accessorial liability. At common law, accessorial liability "rested on the notion that one who helps an offender avoid justice becomes in some sense an accomplice

---

[3] The guidelines were adopted first by the Oregon Criminal Justice Commission and then approved by the legislature. *See generally* ORS 137.667 and ORS 137.669.

[4] Assessing a person's future criminal propensities might be particularly problematic if, as the trial court assumed, the focus is on the person aided, rather than the criminal propensities of the person being sentenced. The trial court would be enhancing this defendant's sentence based on a crime not adjudicated by the court and based on the criminal proclivities of an individual not before the court. Thus, in this case, the only basis on which the trial court made an assessment of Fanus's future dangerousness was through an assumption that, because Fanus had committed a crime in the past, he will commit a like crime in the future, which is an assumption that for many purposes the law does not permit. *See generally* OEC 404 (other crimes evidence not admissible to show a person's tendency to commit crimes). We are unwilling to interpret the guidelines to authorize a sentencing court to enhance a defendant's sentence based on predictions of *someone else's* future dangerousness without an unequivocal expression of the legislature's intent to do so.

[5] The most closely applicable ordinary meaning of "degree" is "a grade or point observed in a measuring or estimating of an action, relation, [or] state of being ✻ ✻ ✻." *Webster's Third New Int'l Dictionary*, 594 (unabridged ed 1993).

in the original crime." Model Penal Code and Commentaries § 242.3, 224 (Official Draft and Revised Comments 1985). One guilty of accessory after the fact was, in effect, derivatively liable for the underlying crime. Consistent with the notion of derivative liability, the accessory had to have knowledge that the principal committed the crime, the principal had to be tried first or jointly with the accessory, the principal's conviction was a prerequisite to punishment of the accessory, and the accessory was subject to the same sentence as the principal. *Id.*

The Model Penal Code (MPC) broke "decisively" from the common-law view of the offense by rejecting its tradition of accessorial liability and adopting instead "the alternative theory of prosecution for obstruction of justice." *Id.* at 224-25. The MPC therefore reformulated the crime as that of hindering apprehension or prosecution. It aimed the prohibition at the "purposeful efforts to aid another to evade justice" and did so "without regard to whether the person assisted in fact committed a crime and with penalties not invariably tied to those prescribed for the underlying offense." *Id.* at 225.

In revising the Oregon Criminal Code in 1971, the legislature substantially adopted the MPC's approach.[6] The legislature repealed the former accessory statute (*former* ORS 161.230) and replaced it with hindering prosecution, codified as ORS 162.325. Although borrowing in part from the MPC, Oregon did not abandon accessorial liability altogether. Rather, it retained the requirement that the person aided be one "who has committed a crime punishable as a felony." *See* ORS 162.325(1). Significantly, however, Oregon shifted the emphasis to the public's interest in preventing the obstruction of justice. The legislature changed the mental state required for hindering prosecution by deleting the requirement that a defendant *know* that the person he or she aided in fact had committed a felony. Instead, the mental

---

[6] Oregon also borrowed the modifications to the MPC provision that had been adopted by New York and Michigan.

state required is the intent to hinder apprehension or prosecution, thus aiding the offender in "escaping justice." *See generally* Commentary to Oregon Criminal Code of 1971, § 162.325, 106 (1975).

■ ■ As that history reflects, hindering prosecution in Oregon is still based in part on accessorial liability for the crime committed by the aided felon, but the penal goal of the offense is to prevent the obstruction of justice. Consistent with that objective, hindering prosecution does not require that an offender know that he or she is aiding someone who in fact committed a crime; it does not require that the person aided have recidivist tendencies; it does not require actual success in avoiding prosecution.[7] To be sure, if the hindering effort is successful, then a felon may go free and may commit crimes in the future. That possibility, however, is at most a potential collateral consequence of the crime's commission. It is not a harm that inheres in the crime's commission or that forms the rationale for criminalizing the conduct.

The trial court's departure under Factor J, therefore, reflects two legal errors. First, the court incorrectly considered harm that was theoretical only, rather than a harm or loss that actually occurred because of defendant's crime. Second, the court focused on the wrong harm altogether—that is, the court did not assess whether defendant's crime interfered with public justice in a way that was significantly greater than is typical for a hindering offense. The departure sentence therefore is not sustainable based on the rationale offered by the trial court for imposing it.

■ We cannot say, however, that there is no basis on which a departure sentence might be authorized in this case. The appropriate disposition, therefore, is to vacate the sentence for hindering prosecution and to remand for resentencing. *See* ORS 138.222(5); *see generally State v. Edson*, 329 Or 127, 139, 985 P2d 1253 (1999) (in restitution context, statute

---

[7] Actual obstruction of a prosecution is not an element of the crime. Under the former crime of accessory after the fact, the state's burden of proof could be satisfied if it showed that a defendant engaged in a prohibited act with the intent to interfere in apprehension or prosecution. Success was not an element. *State v. Clifford*, 8 Or App 494, 491 P2d 1195, 495 P2d 49 (1971), *rev'd* 263 Or 436, 502 P2d 1371 (1972) (finding insufficient evidence to support guilty verdict). The statute has not changed in that regard.

requires remand for resentencing when there remain bases on which trial court might be able to exercise discretion to impose restitution).

Conviction affirmed; sentence vacated; remanded for resentencing.

**BREWER, J.,** dissenting.

I dissent from the majority's conclusion that the sentencing court erred in its application of departure Factor J[1] in sentencing defendant. In order to frame the discussion properly, I begin at a different point of analysis, namely, by clarifying what is not at issue in this appeal.

Defendant does not contend that the evidence in the record was inadequate to support the sentencing court's findings of fact. Defendant was convicted of assisting a fugitive who was accused of committing aggravated murder with a shotgun and assault in the course of a home robbery. The fugitive admitted to defendant that he shot the victim. Defendant nevertheless assisted the fugitive in evading the authorities and traveling to a major population center. The sentencing court found that defendant's conduct exposed the public to a significantly greater risk than is typical for the crime of hindering prosecution. That crime can be committed by assisting a person who has committed any felony, whether violent or not. ORS 162.325. In this case, the underlying offenses were extremely violent, and the risks to the public posed by the fugitive remaining at large were inherently greater than for most other felonies. The court's factual determinations were supported by the record. *State v. Wilson*, 111 Or App 147, 149, 826 P2d 1010 (1992).

As the majority recognizes, the disposition of this appeal turns on defendant's legal argument. The question before us is whether conduct committed in hindering prosecution that exposes the public to significantly greater risk than is typical for that offense constitutes a basis to depart within the meaning of Factor J. Defendant contends that the

---

[1] OAR 213-008-0002(1)(b)(J) authorizes an upward sentencing departure if "[t]he degree of harm or loss attributed to the current crime of conviction was significantly greater than typical for such an offense."

trial court erred because it found that defendant's conduct merely *risked* harm, whereas Factor J requires *actual* harm in order to justify departure. The majority appears to reject defendant's contention but concludes that the trial court erred for other reasons. I will explain my disagreement with the majority's reasoning below. However, in order squarely to resolve defendant's challenge, we must first determine the meaning of the word "harm" as used in Factor J.

In determining the meaning of an administrative regulation, we look first to its text and context. If the meaning remains unclear, then we look to its "legislative history" and, if all else fails, then we resort to general maxims of statutory construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993) (*PGE* template for statutory construction "applies * * * to the interpretation of regulations"). The word "harm" is not defined in the sentencing guidelines or in any related statute. Because it is a word of common usage, it must be interpreted in accordance with its ordinary meaning. *Id.* at 611. In its plain and natural sense, "harm" means "physical or mental damage: INJURY * * * an act or instance of injury * * *: a material and tangible detriment or loss to a person * * *." *Webster's Third New Int'l Dictionary*, 1034 (unabridged ed 1993). The dictionary definition of "harm" comfortably accommodates the notion of personal or individual injuries. In fact, we have consistently held that departure factors involving injury or harm must relate to the designated victim in the context of offenses against persons. *See State v. Reid*, 140 Or App 293, 298-99, 915 P2d 453 (1996) (Factor J not applicable where sentencing court relied on generalized effects of sexual abuse, rather than harm to individual victim); *see also Wilson*, 111 Or App at 152 (application of Factor I requires injury to the victim of sentenced offense).

However, the crime of hindering prosecution does not contemplate an individual victim. As are other crimes compiled in ORS chapter 162, it is an offense against "public justice." Offenses against the public do not necessarily require the element of *actual* harm or injury to a particular person for conviction. *See, e.g.,* ORS 162.065 (perjury); ORS 162.145 to ORS 162.165 (escape); ORS 162.375 (initiating a

false report). Therefore, the dictionary definition of "harm" is not especially helpful in determining its meaning in sentencing for an offense such as hindering prosecution.

A first level *PGE* inquiry does not stop, of course, with a bare recitation of the dictionary definition of harm. *State v. Atkeson*, 152 Or App 360, 364, 954 P2d 181 (1998). We must also examine any well-defined legal meaning it may have. *Stull v. Hoke*, 326 Or 72, 78, 948 P2d 722 (1997); *Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994). "Harm" in the legal sense, depending on the context of its use, is not coextensive with the common meaning of the word. *See Stevens v. Bispham*, 316 Or 221, 228, 851 P2d 556 (1993).

The concept of harm has a broader meaning in its application to criminal offenses against the public. In *State v. Chakerian*, 325 Or 370, 938 P2d 756 (1997), the defendants challenged the constitutional validity of ORS 166.015,[2] the "riot" statute, contending that the statute improperly restrains expression under Article I, section 8, of the Oregon Constitution. In a portion of its analysis upholding the statute, the court was required to determine whether the riot statute was directed to the subject of a communication, or whether it was directed at a *harm* that the legislature was entitled to proscribe. *Id.* at 375. The court concluded that the statute is directed at the prevention of harm, which the legislature defined in terms of the creation of risk to the public:

> "ORS 166.015, by its *terms*, is not directed at speech at all, let alone at restraining the free expression of opinion or the right to speak freely on any subject. Rather, the statute is directed at a *harm*—the creation of a grave *risk* of public alarm." *Id.* at 375 (first emphasis in original; second emphasis added).

In proscribing assistance to fugitives from justice, the hindering prosecution statute is, like the riot statute, designed to safeguard against *risk* to the public. *State v. Clifford*, 8 Or App 494, 499, 491 P2d 1195 (1971), *rev'd on*

---

[2] ORS 166.015 provides:

"(1) A person commits the crime of riot if while participating with five or more other persons the person engages in tumultuous and violent conduct and thereby intentionally or recklessly creates a grave risk of causing public alarm.

"(2) Riot is a Class C felony."

*other grounds* 263 Or 436, 502 P2d 1371 (1972) (offense of hindering prosecution is aimed at conduct with a *tendency* to frustrate the due course of justice). Neither offense requires harm to an individual victim. Thus, the formulation of both offenses is consistent with a legal meaning of "harm" that coincides with the creation of risk. I find nothing else in the text or context of Factor J that meaningfully informs our inquiry. Therefore, I would conclude that the meaning of harm, as used in Factor J, includes the creation of risk to the public where the current conviction is for hindering prosecution.

Although the majority does not appear to disagree with the foregoing meaning of harm, it nonetheless finds two fatal problems with the trial court's application of Factor J, both of which turn on the construction of its language. First, the majority concludes that the harm for which the sentencing court departed was not a different *degree* of harm from what would typically result from the offense of hindering prosecution. In so concluding, the majority slices the word "degree" too finely to suit my view of our task.

Although I agree with the majority that a degree is primarily a quantitative measurement, it is not exclusively so. For example, crimes are frequently defined by degrees. They may vary in severity and penalty, which are quantitative measures. However, they also differ qualitatively, in that each degree of a crime constitutes a separate offense. Alternative common meanings of "degree" capture the mixed nature of the term. For example, one definition of "degree" is "one of the forms or sets of forms used in the comparison of an adjective or adverb to denote a particular intensity or level of the *quality*, quantity or relation expressed by the adjective or adverb." *Webster's third New Int'l Dictionary* at 594 (emphasis added). Another meaning of "degree" is "a positive and unquestionable though undefined *quantitative* measure and qualitative elevation." *Id.* (emphasis added). Accordingly, I submit that the majority defines the term too narrowly to encompass the full range of its ordinary meaning.

Furthermore, the differences between the harm for which the sentencing court departed and the harm typically

resulting from the offense of hindering prosecution are qualitative only in a limited sense. The crime of hindering prosecution requires the creation of risk to the due course of justice. *Clifford*, 8 Or App at 499. The sentencing court departed under Factor J based on the creation of risk to public safety. In a broad sense, those harms are not qualitatively different, because each constitutes the *same* general harm: risk to the public as opposed, for example, to harm to an individual victim. Each constitutes harm to the public but falls at a different point along the spectrum of risk. Viewed in that light, the risk that an offender will not be brought to justice and the risk to public safety that he may pose while at large *do* present differences in degree of harm. The majority's exacting lens for distinguishing between quantitative and qualitative differences in harm is not supported by a reasonable construction of Factor J and, thus, unduly constrains the exercise of the sentencing court's discretion.

The majority finds a second flaw in the trial court's application of Factor J. The majority observes that the rule uses the past tense in referring to harm "attributed" to the current crime of conviction that "was" significantly greater than typical. As a result, the majority concludes that Factor J applies only to completed or realized harms. From that conclusion, the majority decides that the trial court erred because the harm it described was theoretical. I disagree.

Conduct that creates risk is not harmless merely because, in hindsight, the risk did not materialize. Harm arising from risk to the public occurs when the conduct creating that risk is committed. *See Chakerian*, 325 Or at 378. If, as the majority appears to agree, harm to the public includes the creation of risk, then it makes little sense to conclude that such harm evaporates simply because that which was risked is not realized. The legislature's choice of the past tense in describing that harm does not mandate the majority's conclusion.

With respect, the majority's construction of Factor J undercuts the full range of its scope. The sentencing court correctly determined that the harm resulting from defendant's conduct constituted a significantly greater degree of harm than is typical for the offense of hindering prosecution.

Accordingly, the court did not abuse its discretion in imposing a 36-month departure sentence for defendant's conviction.

I respectfully dissent.