**Corrected Reprint 3/19/07**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

HOSVALDO LOPEZ,
            *Defendant-Appellant.*

No. 05-30347

D.C. No.
CR-04-114-KI

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
May 5, 2006—Portland, Oregon

Filed March 12, 2007

Before: William A. Fletcher, and John T. Noonan,
Circuit Judges, and Louis H. Pollak,* District Judge.

Opinion by Judge Pollak;
Concurrence by Judge Noonan

*Honorable Louis H. Pollak, United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

**COUNSEL**

Bryan E. Lessley, Office of the Federal Public Defender, Eugene, Oregon, for the appellant.

Charles W. Stuckey (argued) and Karin J. Immergut, Office of the United States Attorney, Portland, Oregon, for the appellee.

**OPINION**

POLLAK, District Judge:

In February 2005, the District Court of Oregon denied defendant Hosvaldo Lopez's pretrial motion to suppress evidence found in his car. Lopez subsequently pled guilty to possessing methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a), but reserved the right to appeal the denial of his motion to suppress. He was sentenced to a term

of incarceration of 135 months. He now timely appeals from the denial of his pretrial motion to suppress evidence and his resulting conviction. Because we conclude that the police had probable cause to arrest Lopez as an accessory to another crime, and, while in custody, Lopez voluntarily consented to a search of his car, we affirm the District Court's denial of the motion to suppress and the resulting conviction and sentence.

## I.

At a quarter past noon on March 4, 2004, while two law enforcement officers—members of the West Side Interagency Narcotics Team—were interviewing a witness in a narcotics investigation in the front yard of a residence in Hillsboro, Washington County, Oregon, a man drove up, got out of his car and began to approach the group. The witness, however, motioned the man away, and when one of the officers called the man back, the man turned and drew a gun on the officers. According to the officers, the man appeared to try to fire the weapon but then returned to his car—a green Ford Focus— and sped away.

Based on the two officers' description of the suspect, an alert was immediately issued for police to look for "an adult, male Hispanic in his 20s, thin build, taller, wearing a white sweater, and armed with a firearm."[1] An accurate description of the attempted shooter's getaway car—including its make, model, and license plate number—was also provided.

At approximately a quarter to one in the afternoon—about half an hour after the front-yard encounter—the Ford Focus

---

[1]At the suppression hearing, Detective Stephen Schuster first characterized the description received by the police as "Hispanic male, adult, approximately 20 years old with short black hair, thin build, taller," and then, later in his testimony, as an "Hispanic male adult, approximately 20 years of age, tall, thin." Detective Schuster was relying on his memory, as he had not recorded the full description in his report, and he stated that he did not "recall as far as the exact description."

was found nearby, in the parking lot of a Fred Meyer store.[2] Based on the license plate number, the police secured the name of the registered owner—Roberto Lopez Gamez—and his physical description, which included Gamez's height and weight, from the Department of Motor Vehicles.[3]

The police staked out the area. About eight hours later, their vigilance was rewarded. Officers observed a white, 1990s Ford Taurus with tinted windows enter the parking lot and park near the Ford Focus. A female passenger, later identified as Alicia Polish, got out of the Ford Taurus, got into the Ford Focus, started it, and drove off, leaving through the west exit of the parking lot and entering the adjoining road. The Ford Taurus also departed; the driver was observed to be a Hispanic male, approximately twenty years old. Although the Ford Taurus left the parking lot through the southeast exit, it then turned onto the road on which the Ford Focus was traveling and proceeded to follow the Ford Focus at a distance of approximately four hundred yards.

Officers stopped both cars, using a "high risk traffic stop" technique involving multiple police cars, officers, and the pointing of firearms. The driver of the Ford Taurus was ordered out of the car at gunpoint, while surrounded by several police cars and officers. He was told to lie on the ground and was placed in handcuffs. Next, he was patted down for weapons; none were found. The police located his wallet and

---

[2]Fred Meyer is a Northwestern chain of large, "multi-department stores" retailing groceries, apparel, and other goods. *See* Cliff Peale, *For Kroger, Fred Meyer Is the Future: Customers Loyal to Northwest Store*, Cincinnati Post (Ky.), Nov. 16, 1998, at 1A (describing merger of Fred Meyer and Kroger Co.).

[3]The Department of Motor Vehicles' file for Gamez also included a photograph. The record does not make clear when that photograph was made available to police. At the suppression hearing, Detective Schuster initially testified that a photograph of Gamez was brought to the scene, but he then revised his testimony, stating that he could not recall with certainty when the photograph became available.

found a driver's license in the name of Hosvaldo Lopez, the defendant-appellant in this action. Lopez was then detained inside one of the patrol cars. The government alleges, and Lopez does not deny, that, during this process, he twice verbally consented to a search of his car (although the police did not, at that time, conduct such a search). Shortly thereafter, he was asked to accompany police officers to the Hillsboro Police Department.[4] Lopez was transported to the station in the back of a patrol car and, upon arrival, was placed in the custody of detectives. According to police testimony, Lopez was fully cooperative and compliant throughout.

At the station, Lopez was advised, in Spanish, of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and his right to refuse to consent to a search of his Ford Taurus. Following questioning, he was asked to provide written consent to a search of his vehicle, which he did. During their subsequent search, police found a secret compartment behind the back seat of the car, which contained illicit drugs, cash, and a loaded firearm.

It was ultimately determined that the alleged attempted shooter—the suspect sought on March 4, 2004—was Roberto Lopez Gamez, the registered owner of the Ford Focus, and not appellant Hosvaldo Lopez.

---

[4]According to testimony of police officers, although Lopez was nominally "asked" to accompany the police to the station (rather than continue to be questioned on the side of the road), he was not told that he was free to leave, and indeed the officers did not consider him free to leave.

The government states that the request to move Lopez to the station was based both on the desire of officers to ask further questions and on concerns about the safety of interviewing him on the side of the road. The testimony of the officers makes clear that the primary motive for relocating Lopez was to allow investigators at the station to speak with him. Some officers stayed on the roadside with the Ford Taurus for several hours and, at approximately eleven o'clock, conducted a search of the vehicle (the search which has been put in issue by Lopez's motion to suppress) without removing the vehicle from that location.

## II.

Lopez's pretrial motion to suppress argued that, under the Fourth and Fifth Amendments, his stop, detention, and ensuing custody constituted an illegal seizure and that any statements or other evidence obtained from him or from his vehicle must be excluded as fruits of that illegality, or as evidence derivative therefrom. The District Court denied Lopez's motion, holding that (a) the officers had the reasonable suspicion required for an investigative *Terry* stop (*see Terry v. Ohio*, 392 U.S. 1 (1968)), and (b), given that Lopez "substantially fit the description of the suspect," "the arresting officers had probable cause to take defendant into custody." The District Court also found that, at the police station, Lopez validly waived his *Miranda* rights and voluntarily consented to the search of his car.

On appeal, Lopez concedes that the police possessed reasonable suspicion to stop his car, but he maintains that the police lacked probable cause to arrest him and that evidence obtained as a result of that arrest must be suppressed. The government maintains that the arrest was supported by probable cause. According to the government, "[i]t was reasonable to believe that the defendant was either the person involved in the earlier attempted shooting of the police officers or that he was an accessory after the fact, in violation of 18 U.S.C. § 3."[5]

---

[5]In the alternative, the government argues that probable cause was not needed because Lopez's detention was not an arrest, but a valid *Terry* stop, and, therefore, the evidence recovered from Lopez's car was not obtained in violation of the Constitution, because Lopez "agreed to the search . . . voluntarily" while "in investigatory detention." Because we find that the police had probable cause for an arrest, *see infra* Part IV.C, we need not address this alternative argument.

### III.

"In general, we review determinations of motions to suppress de novo." *United States v. Becker*, 23 F.3d 1537, 1539 (9th Cir. 1994) (citing *United States v. Khan*, 993 F.2d 1368, 1375 (9th Cir. 1993)). This court reviews de novo whether probable cause to arrest Lopez existed, as the question raises mixed questions of law and fact. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Carranza*, 289 F.3d 634, 640 (9th Cir. 2002).

"We may affirm a district court's denial of a motion to suppress on any basis supported in the record." *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005); *United States v. Albers*, 136 F.3d 670, 672 (9th Cir. 1998).

### IV.

In our view, the central questions to be addressed in determining whether Lopez's motion to suppress was properly denied are whether, at the time Lopez, at the police station, consented to the search of his car, (a) he was under arrest, (b) there had been probable cause for that arrest, and (c) probable cause had not been dissipated. Because our answers to the latter two questions are dispositive of this appeal, we do not answer the first question, but rather assume without deciding that the District Court was correct in finding that the investigative stop of Lopez's vehicle promptly escalated into what, "for Fourth Amendment purposes," constituted a "full-scale arrest" of Lopez.

In the balance of this opinion, we start by examining what constitutes probable cause. We then address the two theories of probable cause for Lopez's arrest advanced by the government. We find that the government's first theory, while initially adequate to support Lopez's arrest, was no longer viable by the time Lopez consented to the search of his car, since by then the police had acquired additional information that

undercut probable cause. But we further find that the government's second probable cause theory not only validates Lopez's arrest, but remains supportive of Lopez's continuing arrest status at the time of his consent to the search of his car. Because we find that there was probable cause to arrest Lopez, and that the probable cause was still in force at the time Lopez consented to the search, we hold that the District Court properly denied the motion to suppress.

## A.    The probable cause standard

**[1]** Under the Fourth Amendment, a warrantless arrest requires probable cause. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Alternatively, this court has defined probable cause as follows: when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959)).

**[2]** Probable cause is an objective standard. The arresting officers' subjective intention (i.e., in this case, the crime for which they thought they were arresting Lopez) is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause . . . . [H]is subjective

reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (citations omitted)); *Whren v. United States*, 517 U.S. 806, 814 (1996). Generally, "an officer need not have probable cause for every element of the offense." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994). However, as will be relevant to our discussion below, *see infra* Part IV.C, "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." *Id.*[6]

In some instances there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime. In such cases, execution of the arrest or continuation of the arrest is illegal. As we explained in *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 358 (2006):

> A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated. "As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (citation omitted) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.").

---

[6]This requirement arises from the deeply-rooted precept "that a person is not criminally responsible unless criminal intent accompanies the wrongful act." *Gasho*, 39 F.3d at 1429 (citing *Morissette v. United States*, 342 U.S. 246, 251 (1952)).

In light of *Ortiz-Hernandez*, the critical question before us is whether the police had probable cause when they questioned Lopez at the police station and obtained written permission to search his car. It will not suffice that, at some earlier point in time—before the police gleaned certain "dissipating" facts—the police may have had probable cause. The question we must answer is: At the time that Lopez was Mirandized and signed the written consent, did the totality of the facts available to the police provide probable cause?

## B.   Probable cause to arrest Lopez as principal

The District Court was satisfied that there was probable cause to hold Lopez under arrest for the attempted shooting, given Lopez's observed interaction with the green Ford Focus and the fact that he "substantially fit the description of the suspect." We conclude, however, that when, subsequent to Lopez's having been brought to the police station, he was asked to consent to the search of his car, the police lacked probable cause to believe that Lopez was the attempted shooter.

**[3]** While Lopez matched the general description of the suspect as a young Hispanic man, he did not fit the more specific aspects of the description—a description which had been provided by two trained law enforcement officers and had proved to be entirely accurate with respect to the getaway car. Most notably, Lopez is rather short at 5′6″, while the suspect was described as "taller" or "tall." Lopez and the suspect also differed with regard to several mutable—and hence less consequential—characteristics or features: The suspect had a gun, but Lopez was found to be unarmed. The suspect did not wear eyeglasses, but Lopez was wearing prescription glasses. And the suspect was described as wearing a sweater, but Lopez, when apprehended, was not wearing a sweater.

**[4]** "Under the law of this Circuit, mere resemblance to a general description is not enough to establish probable cause."

*Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002); *see, e.g.*, *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990) (finding that officers did not have probable cause to arrest suspect merely because he appeared to match separate reports describing a " 'young, thin man, not too tall' " and a " 'young, Mexican male' "); *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1132, 1134 n.22 (9th Cir. 2000) (en banc) (noting that racial or ethnic characteristics alone are insufficient to establish reasonable suspicion, and holding that, where no particularized suspicion exists, racial resemblance is not relevant or appropriate to the reasonable suspicion analysis). However, it is permissible to consider a general physical description where it is found in combination with other particularized bases for suspicion. *See Montero-Camargo*, 208 F.3d at 1134 n.21; *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (holding that racial appearance may be relevant where there are other factors creating suspicion).

**[5]** In this case, Lopez's resemblance to the suspect in terms of age, gender, and ethnicity had some, albeit modest, probative weight; however this modest weight was itself undercut by disparities which suggested that Lopez was not the sought-after suspect. Indeed, the government's brief states that "the critical factor giving rise to probable cause was not the general description of the suspect, but the connection between the defendant and the suspect car, the green Ford Focus."

**[6]** The government's analysis, however, overstates the significance of Lopez's connection to the getaway car, insofar as it is contended that the connection shows Lopez was the attempted shooter. *But cf. infra* Part IV.C. And, more importantly, the government's analysis fails to account for substantial, countering indicators. The effect of evidence which may support, or incline toward, a finding of probable cause can, of course, be vitiated by countervailing evidence. *See Ortiz-Hernandez*, 427 F.3d at 574. This was the case here, where

there was substantial evidence known to the police tending to show that the defendant was not the person responsible for the earlier attempted shooting.

It is well established that a person's mere presence or "mere propinquity to . . . criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (holding that police lacked probable cause to search a person based solely on his presence in a tavern at a time when the police had reason to believe the bartender possessed heroin for sale). We have distinguished the "mere presence" doctrine from cases in which the "facts and circumstances . . . support an inference that [an] individual is connected to the proximate criminal activity." *United States v. Buckner*, 179 F.3d 834, 839 (9th Cir. 1999). Although the government argues that this is such a case, we find this case distinguishable from *Buckner* and the other cases cited by the government.

In *Buckner*, we concluded that the "attendant facts and circumstances support[ed] a fair probability" that the defendant —the sole passenger in a car carrying thirty-seven pounds of marijuana hidden in the dashboard and rear panels—"was linked to the crime of drug trafficking." *Id.* We noted a number of relevant facts, including the following: the car belonged to neither occupant and was procured under suspicious circumstances, the car was entering the United States from a Mexican city known as a drug source, and officers considered it typical for drug traffickers to travel in pairs to deflect suspicion. *Id.* at 837, 839; *see also Carranza*, 289 F.3d at 640 (finding probable cause where inspectors knew that defendant was sole passenger in vehicle carrying commercial quantity of illegal drugs across the border; there was strong smell of gasoline coming from the vehicle, and gas tanks are frequently used to smuggle drugs; and driver of the vehicle made suspicious, false statements); *United States v. Valencia-Amezcua*, 278 F.3d 901, 906-08 (9th Cir. 2002) (finding probable cause based on defendant's physical proximity to the crime scene

and suspicious conduct in helping to attempt to conceal a secret door).

**[7]** The instant case is unlike *Buckner*, *Carranza*, and *Valencia-Amezcua* in several respects. To begin, Lopez was not directly or immediately associated with the scene of the crime (the attempted shooting). The public parking lot to which he delivered Ms. Polish (approximately eight hours after the incident involving the Ford Focus driver and the law enforcement officers) was at least some distance away from the crime scene, and Lopez did not make direct contact with the getaway vehicle—Polish was the one to take possession of the Ford Focus. In *Buckner* and *Carranza*, by comparison, the arrested person was present in a car when it was found to be transporting illegal drugs—providing both temporal and physical proximity to the commission of a crime. *See Buckner*, 179 F.3d at 838; *Carranza*, 289 F.3d at 637-39; *see also Valencia-Amezcua*, 278 F.3d at 907-08 (noting defendant's physical and temporal proximity to the crime scene).

**[8]** Moreover, we find that attendant facts gathered by the police tended to dissipate, rather than support, probable cause to believe Lopez was the attempted shooter.[7] After he was stopped, Lopez was positively identified as Hosvaldo Lopez, the registered owner of the Ford Taurus he was driving. When the police removed Lopez's driver's license from his wallet, they could readily compare it with the information they had from the Department of Motor Vehicles regarding the owner of the Ford Focus and see that Lopez and Gamez had different names. The police were also in a position to observe that Lopez's appearance did not match the Department of Motor Vehicles' physical description of Gamez.[8] It should then have

---

[7]The only attendant fact highlighted by the District Court as contributing to its probable cause determination was Lopez's general resemblance, as a young Hispanic male, to the suspect—discussed *supra*. There is no indication in the record that the police found other features, such as his car's tinted windows, to be problematic.

[8]The record does not include the full contents of the DMV information for Gamez. However, Detective Schuster testified that the police had this

been manifest that Lopez was not Gamez, the registered owner of the getaway car. Furthermore, police officers testified that "Lopez was actually very cooperative" and responded appropriately and "without hesitation" to all of the officers' requests. *Cf. United States v. Mills*, 280 F.3d 915, 921 (9th Cir. 2002) (finding that defendant's suspicious remarks to the police were a factor supporting probable cause).

**[9]** By the time Lopez was brought to the police station for questioning and to give consent to the search of his car, the police had observed and gathered a substantial amount of information. Given the totality of the facts the police had assembled by the time they commenced questioning Lopez at the police station, we conclude that the police did not then have probable cause to believe that Lopez was the attempted shooter.

## C.   Probable cause to arrest Lopez as accessory

Our conclusion that, at the time Lopez was questioned at the police station, the police did not have probable cause to regard Lopez as the attempted shooter does not, however, end our inquiry. The government's brief on appeal suggests that, even if there was an insufficient basis from which to infer that Lopez was the person responsible for the earlier attempted shooting, there was still probable cause to arrest him as an accessory after the fact under 18 U.S.C. § 3. This basis for probable cause was not argued to the District Court, nor was its Oregon state law counterpart, Or. Rev. Stat. § 162.325 (2003) ("Hindering prosecution"). However, as noted above, we can affirm on any basis evident in the record. *Ruiz*, 428 F.3d at 880.

---

information, and that it matched or was "similar" to the eyewitness description of the attempted-shooting suspect as "taller" or "tall." Detective Schuster also testified that he would not describe Lopez, who "was 5′6″ based on his DMV information," as "taller."

**[10]** Under 18 U.S.C. § 3, "Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." 18 U.S.C. § 3. In addition to the *actus reus* of receiving, relieving, comforting or assisting the offender, we have interpreted this statutory language to require (1) specific intent to frustrate law enforcement, *see United States v. Hill*, 279 F.3d 731, 737 (9th Cir. 2002); (2) "commission of the underlying offense" by the principal, *see United States v. Innie*, 7 F.3d 840, 850 (9th Cir. 1993); and (3) actual, specific knowledge of the underlying crime on the part of the accessory, *see United States v. Graves*, 143 F.3d 1185, 1190 (9th Cir. 1998) (as amended); *cf. United States v. Burnette*, 698 F.2d 1038, 1051 (9th Cir. 1983) (noting that such knowledge "may be shown entirely through circumstantial evidence").

**[11]** The elements of the analogous Oregon crime of hindering prosecution are essentially the same—the commission of the underlying crime, acts aiding the perpetrator of that crime in escaping justice, and the intent to frustrate law enforcement—with the important exception that knowledge of the underlying crime is *not* required. *See* Or. Rev. Stat. § 162.325;[9] *State v. Allred*, 995 P.2d 1210, 1213-14 (Or. Ct. App. 2000) (noting 1971 legislative amendment "deleting the

---

[9]A person commits the crime of hindering prosecution if,

with intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony . . . the person: . . .

(c)  Provides or aids in providing such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension; or . . .

(e)  Suppresses by any act of concealment, alteration or destruction physical evidence which might aid in the discovery or apprehension of such person . . . .

Or. Rev. Stat. § 162.325(1).

requirement that a defendant *know* that the person he or she aided in fact had committed a felony").

**[12]** The extent to which Lopez fit the general physical description of the attempted shooter is obviously not relevant to an assessment of probable cause to arrest as an accessory under 18 U.S.C. § 3 or Or. Rev. Stat. § 162.325. The relevant inquiry is whether the police had information that would reasonably lead to the conclusion, by a fair probability, that Lopez knew that the attempted shooter had committed an offense against the United States[10] (or, as to Oregon law, that the attempted shooter was being sought by law enforcement), and that Lopez was acting to assist the attempted shooter in order to hinder or prevent his apprehension. We undertake this inquiry based on the totality of the circumstances. *See supra* Part IV.A. However, because 18 U.S.C. § 3 and Or. Rev. Stat. § 162.325 define specific-intent crimes, we are also called upon to determine whether the police had probable cause to believe Lopez was acting with the specific intent to frustrate law enforcement. *See supra* Part IV.A (citing *Gasho*, 39 F.3d at 1428).

**[13]** Although we find a dearth of specifically applicable precedent,[11] we are satisfied that the facts known to the police in

---

[10]The arresting officers were state officers. Our review of Oregon statutory and case law leaves us unsure whether, in Oregon, state law enforcement officers have authority to arrest for violations of federal law. Under some circumstances this could be of import, because whether an arrest is valid under state law can be relevant to deciding whether that arrest is valid for Fourth Amendment purposes. *See United States v. Miranda-Guerena*, 445 F.3d 1233, 1238 (9th Cir. 2006) (McKeown, J., concurring); *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000); *United States v. Mota*, 982 F.2d 1384, 1387-89 (9th Cir. 1993). We need not decide if such circumstances are present here, however, because we conclude that the officers had probable cause to believe Lopez had violated not only federal law, but Oregon law as well. *See* text *infra*.

[11]We do not find *United States v. Hill*, 279 F.3d 731 (9th Cir. 2002)— the sole case cited by the government to support probable cause to arrest

this case provided probable cause under the standard discussed in Part IV.A and the previous paragraph. The Ford Focus had been used as a getaway car,[12] and presumably then abandoned, by a man who tried to use a firearm in an attempt to escape the scrutiny of narcotics investigators. The police could reasonably infer that this man, who was apparently ready to gun down a law enforcement officer, was involved in additional criminal activity—specifically, narcotics activity—and that he was also likely to have criminal associates. It was also logical to assume that the attempted shooter would be afraid to return and retrieve the car himself, and, moreover, that he might turn to a trusted associate for help. The background facts available to the police thus supported the inference of a fair probability that Lopez knew the Ford Focus was connected to a federal or Oregon crime.

---

Lopez as an accessory—to be helpful. The *Hill* court, in the course of weighing a privacy-based, constitutional claim (not a Fourth Amendment issue), found that the defendant had "self-evidently intended" to frustrate law enforcement where she had "attempted to orchestrate . . . delivery" of possessions to her husband—*while also providing him with* "shelter, employment, money, food and other material support." *Id.* at 737. The government seeks to draw a parallel between these facts and Lopez's alleged attempt to "orchestrate . . . delivery" of the attempted shooter's car. As we have just noted, however, *Hill* listed an attempt to deliver possessions to a fugitive as a cumulative fact pointing to accessory liability in a case involving extensive additional evidence. *Hill* illustrates that picking up or taking possession of a fugitive's possessions can—under some circumstances—constitute evidence that one is acting as an accessory to that fugitive's crime. But because the scope and content of the assistance rendered by the defendant to the fugitive was much broader and better developed in *Hill* than in the case before us, *Hill* provides little help in deciding whether Lopez's actions in helping to recover the Ford Focus—presented in the much sparser evidentiary context of our case—were sufficient to justify arrest in what, we find, is "a close case." *Cf. Hill*, 279 F.3d at 737 (noting that "this is not a close case" as to criminal intent).

[12]In Oregon, a getaway car is considered an instrumentality of the crime. *See State v. Walden*, 515 P.2d 407, 409 (Or. Ct. App. 1973); *State v. Keith*, 465 P.2d 724, 726 (Or. Ct. App. 1970).

Set against this background, Lopez's actions in helping to rescue the Ford Focus provided further reason to believe that he was acting to assist the attempted shooter and to hinder the latter's apprehension and prosecution. Lopez arrived at the Fred Meyer parking lot and drove directly to the Focus. He dropped off an associate who had the keys to the Ford Focus —suggesting a personal link to the car's earlier driver, the attempted shooter. As Lopez's associate departed from the parking lot's west exit in the Ford Focus, Lopez guided his Ford Taurus out of the lot through the southeast exit—but soon doubled back and rejoined the Ford Focus, trailing about four hundred yards behind while traveling in the same direction.

Even in the face of this suspicious behavior, there is, of course, a possibility that Lopez was an unwitting acquaintance of Ms. Polish's, who simply drove her to the parking lot, with no guilty knowledge or illicit motive. However, the police were not required to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence, that Lopez had committed a crime —what was required was a fair probability, given the totality of the circumstances. The police had good reason to suspect that a criminal enterprise (the recovery of the Ford Focus, with the intent to impede the identification of the vehicle's owner, the attempted shooter) was afoot, and that Lopez was playing a key role in that enterprise. Lopez was connected to the Ford Focus—an instrumentality of the underlying crime— and he appeared to be taking steps to avoid detection. Upon being stopped, Lopez apparently offered no explanation for his actions.[13] A plausible, innocent explanation for his conduct

---

[13]Apart from disclosing one's identity, *see Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 187-89 (2004), a person detained by police has no general obligation to answer questions or volunteer information. *See, e.g.*, *Davis v. Mississippi*, 394 U.S. 721, 727 n.6 (1969); *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 842 n.18 (9th Cir. 2003), *abrogated in part by Hiibel*, 542 U.S. 177.

might have dissipated the effect of the incriminating facts canvassed above; without such an explanation, Lopez's connection to the Ford Focus might well have seemed to a reasonable police officer to be of real significance.

**[14]** We think that Lopez's role in bringing a driver to rescue the Ford Focus, taken in conjunction with his apparent effort to follow the Ford Focus out of the parking lot, could properly have been perceived by a police officer as suspicious activity. While not of overwhelming evidentiary weight, this activity could have been regarded by a reasonable police officer as grounding an inference that Lopez was assisting a federal offender—the attempted shooter—with the intent to hinder or prevent his apprehension. We therefore find that the police had probable cause to believe Lopez was an accessory after the fact, under 18 U.S.C. § 3, to the attempted shooter's crime, and that the police did not act unreasonably in holding him under arrest without a warrant while they investigated further. Since Oregon's "hindering prosecution" statute does not require as extensive a showing as its federal counterpart, *see supra* text at note 10, our finding of probable cause under 18 U.S.C. § 3 applies *a fortiori* to Or. Rev. Stat. § 162.325.

## D.   The motion to suppress

**[15]** We have concluded that the knowledge and information available to the police would have led a reasonable officer to believe that there was a fair probability that Lopez was an accessory to a crime committed in the course of the attempted shooting. The police gathered no information tending to dissipate that inference prior to the point at which Lopez consented to the search of his car. Accordingly, we find that, at the point when Lopez signed the consent to search, the police validly held Lopez under arrest pursuant to probable cause. Because the arrest was justified by probable cause, and the consent to search was voluntary, the District Court correctly denied the motion to suppress.

## V.

Accordingly, we AFFIRM the decision of the District Court denying Lopez's motion to suppress, and we AFFIRM the resulting judgment of conviction and sentence.

**AFFIRMED.**

---

NOONAN, Circuit Judge, concurring in the judgment:

What the police knew was that Lopez was not the registered owner of the Ford Focus whose rescue he had aided and whose driver he had then taken steps to follow. What would these facts suggest to a reasonable police officer? The police knew that the gunman had engaged in a desperate enterprise — an attempt to break up a police investigation by directing deadly force at the police themselves. Would such a criminal have used his own car? Not likely. That Lopez didn't own the Ford Focus didn't help him a bit. In terms of diluting probable cause it was a zero, just as his submissive behavior was a zero.

What might have dissipated probable cause was a plausible explanation by Lopez of why he engaged in the rescue of the Ford Focus. At the suppression hearing, he offered no less than two accounts of why he dropped off the lady with the keys to the Ford Focus and why he followed her out of the parking lot. The record is barren of evidence that he offered these explanations to the police at the time of his arrest. Lopez's failure to give an innocent connection with the car must have loomed large in the mind of the police. Only an unreasonably slack officer would have brushed off the connection.

That Lopez had no idea why he had been pursued from the parking lot, surrounded by police cars, and at gun point

ordered to the ground is unbelievable. Nothing suggests that this drug dealer was a moron. He couldn't figure out that his part in rescuing the Ford Focus and following it in tandem had made the police suspicious? It was his burden to show that the police had been given a plausible story to account for his extraordinary conduct. He had a fair amount of time to converse with the officers. When the record is silent, the inference is inescapable that he kept his mouth shut.

If Lopez was not himself the gunman, it was probable that he was in on the gunman's scheme. The police knew that the gunman was part of a drug conspiracy. Why else would the gunman have tried to use a gun to stop a police narcotics investigation? It was reasonable to think that a conspiracy of this kind, leading to an act of violence against law enforcement, must have more than two members. The chances were fair that the gunman would not himself return to the car but use another member of the gang to get it. Arriving, after dark, in a car whose windows were tinted so darkly that they violated state law, Lopez drove directly to the car that had been used in the attempted shooting earlier in the day, dropped off a driver with keys fitting that car, and then, after the kind of evasive maneuvers designed to thwart surveillance, had followed the Focus. There was a fair probability that Lopez's actions were those of, if not the gunman himself, then a fellow conspirator.

As long as Lopez did not offer an explanation of his role — and the record shows no evidence that he did at the police station — a police officer could reasonably believe that they had in custody either the gunman himself or another participant in the drug conspiracy the gunman was trying to defend by his desperate assault on the police. Either way, probable cause was present and undiminished at the time that Lopez consented to the search of his car.