**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOAQUIN CIRIA,

        *Plaintiff - Appellee,*

  v.

ARTHUR GERRANS; JAMES CROWLEY,

        *Defendants - Appellants*,

and

CITY AND COUNTY OF SAN FRANCISCO, NICOLAS RUBINO, SAN FRANCISCO POLICE DEPARTMENT,

        *Defendants*.

No. 24-3308

D.C. No.
4:22-cv-07510-KAW

OPINION

Appeal from the United States District Court
for the Northern District of California
Kandis A. Westmore, Magistrate Judge, Presiding

Argued and Submitted April 8, 2025
San Francisco, California

Filed June 5, 2026

Before: Mary M. Schroeder, Richard A. Paez, and Eric D. Miller, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Miller

## SUMMARY[*]

### Qualified Immunity

In an interlocutory appeal, the panel affirmed the district court's order denying qualified immunity to San Francisco Police Department Inspectors James Crowley and Arthur Gerrans ("Defendants") on Joaquin Ciria's fabrication-of-evidence and malicious prosecution claims under 42 U.S.C. § 1983.

Ciria was exonerated after serving thirty-two years in prison for the 1990 murder of Felix Bastarrica. The San Francisco District Attorney's Innocence Commission found that his conviction could not stand and that he was factually innocent. According to the Commission's investigation, George Varela, the star witness at Ciria's criminal trial, had falsely named Ciria as the shooter and was granted immunity in exchange for his testimony. In his 42 U.S.C. § 1983 action, Ciria alleged in part that Defendants acted with deliberate indifference to or reckless disregard of his right

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not to be criminally charged based on fabricated evidence and maliciously prosecuted him.

Addressing the fabrication-of-evidence claim, the panel held under this court's precedents and based on the assumed facts, a reasonable jury could find that Defendants (1) were deliberately indifferent or exhibited reckless disregard towards Ciria's right not to be charged based on fabricated evidence, (2) fabricated evidence against Ciria by using interrogation tactics including threatening Varela with an adult murder charge and offering him a story that exculpated him to get him to name Ciria as the shooter, and (3) knew or should have known Varela was not telling the truth.

The panel held that it was clearly established at the time of the investigation in 1990 that Defendants' conduct would violate Ciria's due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Further, any reasonable officer would know that threatening a young witness and offering him a story that insulates him from liability to get him to falsely implicate a suspect violates the accused suspect's due process rights.

The panel next held that Defendants were not entitled to qualified immunity on Ciria's malicious prosecution claim at this stage. Considering all of the surrounding circumstances, and viewing the facts in the light most favorable to Ciria, it is not reasonably arguable that the officers had probable cause to arrest Ciria and charge him with murder. The state of the law in 1990 gave Defendants fair warning that they lacked probable cause to arrest and charge Ciria with first-degree murder.

Dissenting, Judge Miller wrote that even assuming the officers violated Ciria's constitutional rights, Ciria cannot

show that the relevant rights were clearly established at the time of the investigation in March 1990. He would therefore reverse the district court's denial of qualified immunity to Defendants on both claims.

**COUNSEL**

George C. Harris (argued), Janelle T. Sampana, James Bennett, and Matthew Ohlheiser, The Norton Law Firm PC, Oakland, California, for Plaintiff-Appellee.

Peter J. Keith (argued), Chief of Special Litigation; Aaron Wiener and Jose Zelidon-Zepeda, Deputy City Attorneys; Jennifer E. Choi, Chief Trial Deputy; Yvonne R. Meré, Chief Deputy City Attorney; David Chiu, City Attorney; San Francisco City Attorney's Office, San Francisco, California; for Defendants-Appellants.

# OPINION

PAEZ, Circuit Judge:

On April 18, 2022, Joaquin Ciria was exonerated after serving thirty-two years in prison. The San Francisco District Attorney did not oppose his release; in fact, after a five-month investigation, the District Attorney's Innocence Commission unanimously found that Ciria's murder "conviction [could not] stand" and that Ciria was "factually innocent."

According to the Commission's investigation, George Varela, the star witness at Ciria's criminal trial and an accomplice to the actual shooter, had falsely named Ciria as the shooter in a San Francisco murder. Ciria argues that Varela, 18 years old at the time, did so only after Inspectors Crowley and Gerrans ("Defendants") threatened to charge Varela with murder unless he adopted the story they fed him. Ciria argues that Defendants operated with tunnel vision during their investigation: they decided that Ciria was the shooter and then, to support their case, deliberately elicited Varela's statement naming Ciria through abusive and threatening tactics. Once they secured Varela's statement, they charged Ciria with murder, never investigating Ciria's alibi or corroborating Varela's account. Outside of Varela's statement, Ciria argues, Defendants based their murder charge on little more than rumors and similarities to a general physical description. Ciria further argues that Defendants acted with deliberate indifference to or reckless disregard of his right not to be criminally charged based on fabricated evidence, *see Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013), and relatedly, that Defendants maliciously prosecuted him.

In this interlocutory appeal of the district court's order denying Defendants qualified immunity on Ciria's fabrication-of-evidence and malicious prosecution claims under 42 U.S.C. § 1983, we affirm the district court's order. We hold that a reasonable jury could find that Defendants used coercive and abusive tactics to elicit a fabricated statement against Ciria and that in 1990, it was clearly established that doing so would violate Ciria's constitutional rights. We also hold that because a reasonable jury could find that Defendants lacked probable cause to charge Ciria without Varela's statement and it was not "reasonably arguable" that probable cause existed, Defendants are not entitled to qualified immunity on Ciria's malicious prosecution claim. *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis omitted).

## I. Background

### A. Facts

The facts about Inspectors Crowley and Gerrans's investigation are drawn largely from their declarations on summary judgment, plus copies of handwritten notes and transcripts of recorded interviews from their investigation. Viewing the evidence in the light most favorable to Ciria, we focus on what the inspectors knew at the time they interrogated Varela and charged Ciria with murder. *See Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

### 1.

We note at the outset that Ciria has presented evidence from which a reasonable jury could find that the inspectors' records of their investigation are at times incomplete, inaccurate, and skewed towards corroborating Ciria's guilt.

Ciria first points to evidence of inaccurate notes. For example, one witness, Edward Lavalle, has declared that he did not make certain statements attributed to him in the inspectors' notes, observing further that the phone number listed in the notes as his number was not his. Ciria next points to evidence that important parts of the investigation were never documented. For example, one witness from Galan's Bar, a bar where Ciria was a patron shortly before the murder, declared that he had been interviewed at the bar and had told the officers what Ciria was wearing that night (which did not match the eyewitnesses' descriptions of the shooter's clothing)—but that interview is never mentioned in the investigative record. Another witness, Mercedes Mora, declared that her interview notes left out key context: her daughter told the inspectors not to interview Mora and come back another time because Mora had suffered two epileptic attacks and was not mentally or physically prepared to talk to anyone. Another witness testified in her deposition that the notes from her interview omitted certain exculpatory statements.

Finally, Ciria points to evidence that Defendants may have incentivized certain witnesses with the prospect of monetary rewards, which may diminish the reliability of their statements. For example, one of the inspectors' notes said, "Antonio and his wife came to the homicide detail this date and asked me if I was lying to him about receiving a reward in this case . . . . I showed Antonio and his wife a copy of the Mayor[']s ten thousand dollar reward authorization."

2.

With that context in mind, we recount the investigation up to Varela's interrogation, as described in the inspectors'

declarations and accompanying notes.  On March 25, 1990, Inspectors Crowley and Gerrans responded to the scene of a murder.  Felix Bastarrica, a Cuban man, had been shot in a narrow alleyway behind a San Francisco motel.

Two men, Kenneth Duff and Anthony Queen, had witnessed the shooting from their car and spoke to the inspectors at the scene.  They said that they saw a man get out of the passenger seat of a white and yellow Chevy Monte Carlo.  This man confronted another man on the sidewalk, arguing loudly in a foreign language, possibly Spanish.  The man from the Monte Carlo then shot the man on the sidewalk, got back in the car, and left.  Duff and Queen described the shooter as "dark-skinned, Middle Eastern or possibly Iranian," 5'10" or 5'11", in his late 30s, around 190 pounds, and "wearing an olive green 'London Fog type coat'" and "darker slacks."

Later that night, Gerrans interviewed the only other eyewitness, Kathleen Guevara.  She stated that she was in her second-floor apartment on the same street where Bastarrica was murdered when she heard a loud argument and saw a large white car from her window.  She saw two men yelling at each other and walking around for about two minutes, before one man shot the other.  She described the shooter as a forty-year-old black male of "stocky build" who was wearing an overcoat.  She said, however, that it was "[h]ard to tell" his height and weight because she "was looking down on him."

Next, Crowley and Gerrans interviewed Edward Lavalle, Bastarrica's brother-in-law, who had been staying with Bastarrica the day of the murder.  Lavalle explained that he thought that Bastarrica was involved in selling narcotics.  He said that Bastarrica had told him that he witnessed a murder

the night prior: his friend, Roberto Socorro, killed Ruben Alfonso. Lavalle never mentioned Ciria's name.

After this interview, the inspectors pulled Bastarrica's rap sheet and an incident report of a December 27, 1989, arrest. This report referred to a drug seizure, which involved five arrestees, including Ciria and Socorro. The arrest report noted Ciria was 5'9", 193 pounds, and a black man.

Over the next few days, Crowley and Gerrans heard that there was a "drug war" going on between the "Cubans" that was related to Ruben Alfonso's murder. The inspectors heard from witnesses that Socorro had killed Alfonso after an argument about drugs and money and that Socorro had since left town with a person called "Manolo." No one ever reported that Ciria was involved in or present at Alfonso's murder.

The inspectors then interviewed a person named Charles Austin, who was present at Alfonso's murder. Based on a partial transcript of the interview, Austin stated that Ciria, Alfonso, Socorro, and Bastarrica used to work together selling drugs and that Ciria and Bastarrica could not stand each other. Austin admitted that he had no personal knowledge about Bastarrica's murder but that he had heard about it from a friend and read about it in the newspaper. He said that the "word" was "all over" that Ciria had killed Bastarrica and that "people say that [Ciria] was there."

Crowley and Gerrans met with Kathleen Guevara, one of the eyewitnesses, to see if she could identify Bastarrica's shooter. Crowley had prepared a six-photo array that included Ciria's most recent mugshot. According to the inspectors' notes, Guevara could make only a comparative identification of Ciria, saying, "of the six mugshots, 'this looks the most like the suspect—especially the profile, or

maybe more the attitude.'" Crowley confirmed in his deposition that this did not constitute a positive identification.

The following week, Crowley and Gerrans met with Duff, the other eyewitness to the shooting. Duff was also shown a mugshot spread with Ciria's photograph. He was unable to make an identification. According to Gerrans's deposition testimony, as a matter of practice, "[i]f somebody doesn't identity somebody in a lineup or a mug spread, then that's that. It's over with as far as [he is] concerned."

In Duff's interview, he confirmed that the suspect was "wearing a dark raincoat, like, greenish type coat, with dark pants." He said he thought the shooter was "Hindu" but agreed with an inspector's suggestion that he could be a black man. He described the shooter as a stocky man, "almost 6 [feet]," and in his early 30s.

Another week later, Crowley and Gerrans interviewed Mercedes Mora at her home, over Mora's daughter's objections. Mora had lived with Ciria for several years as his common-law wife before he left her for a younger woman. She told them that Socorro, Alfonso, Bastarrica, and Ciria had been fighting over drugs and money and that she felt "very strong in her heart" that Ciria killed Bastarrica "because of the things he says and his attitude." She claimed that she had seen Ciria near the hotel on the morning Bastarrica was killed, told Ciria that Socorro had killed Alfonso the night before at the Star Motel, and given Ciria Bastarrica's address.

Mora also said that someone named "Candito" was telling people at Bastarrica's funeral that Ciria had killed Bastarrica. Candito was a black Cuban male around Ciria's age who was 5'9" or 5'10," muscular, and also staying at the

Star Motel. The investigators' notes do not indicate much more information about this man, but in a 2020 declaration, Socorro named a "Candido" as Bastarrica's actual killer and explained that, like the shooter, Candido "had a distinctive and dramatic way of dressing . . . He almost always wore long dark trench coats." Notably, Crowley and Gerrans never investigated this "Candito"/"Candido." Crowley claimed in his deposition that Ciria was the only suspect they investigated because "[n]obody ever brought any attention to anybody [else] as a suspect."

The next day, Ciria, with an attorney present, voluntarily spoke with Crowley and Gerrans. He denied any involvement with the murder. He explained that people were spreading false rumors that he killed Bastarrica. He also offered an alibi: he had been out with Varela earlier in the evening at a video game arcade around 7:30 p.m., they went to Galan's Bar around 8 p.m., he got in a bar fight there, and then Varela dropped him home around 8:25 p.m. Ciria then spent the rest of the evening with his wife, Yojana Paiz, his son, and their housemate, Marina Flores. Ciria stated that he would take a polygraph test, but his counsel advised against it. The inspectors never interviewed Ciria's alibi witnesses until after they had charged him with murder.

Other than the Varela interrogation, the aforementioned evidence was the only evidence the inspectors had when they arrested Ciria and signed a criminal complaint charging him with first-degree murder. The inspectors never had any physical evidence linking Ciria to the crime. The ballistics report identified a ".44 S&W Special Charter Arms 'Bulldog'" revolver as the murder weapon, but there was no evidence that Ciria owned such a weapon. They never asked anyone whether Ciria, or any other person, owned or was ever seen wearing a trench coat like the one witnesses

observed that night.  They never corroborated with anyone that Ciria was at Galan's Bar that night, what Ciria was wearing there, or when he left the bar.  They never asked Yojana Paiz or Marina Flores about Ciria's alibi or his apparel.  No eyewitnesses saw Ciria near the murder scene that night, and neither of the two eyewitnesses could positively identify Ciria from a photo array.  The inspectors also knew that someone who matched the eyewitnesses' description of the shooter had been telling people that Ciria had killed Bastarrica.

3.

This brings us to Varela's interrogation.  Varela began by corroborating Ciria's innocence.  He explained he was downtown with Ciria at an arcade until around 7 p.m. to 7:30 p.m.  He then drove Ciria to a bar that Ciria wanted to quickly visit.  They arrived there around 8 p.m.  Soon after, Varela noticed that Ciria was involved in a bar fight.  Varela then drove Ciria home, dropped him off, and returned home before 9 p.m.

The inspectors[1] then asked whether Varela had been in an alleyway that night.  Varela denied that he had been there.

---

[1] The District Attorney's transcript does not distinguish or specify whether Crowley or Gerrans was speaking during the interrogation.  For simplicity, we refer to whichever officer was speaking as "the inspectors" or "Inspector."

The following is a transcription of what occurred next, around four minutes into the interrogation:

Inspector:   Okay, I want to tell you something.  Do you understand how the law works—can you look at me?

. . .

Can you look at me?  You understand how the law works, if—if two people go out together, alright?  And they take type—any type of action where—you said you don't know, in your mind, *you don't know that Joaquin was planning on killing somebody.* Just say you go with Joaquin, and in your mind you know that he's either going to beat a guy, he's going to beat somebody up, or maybe he's going to rob somebody, or maybe he's going to thump somebody, or kick his ass.  So you don't know, in your mind, you're not planning on killing him. Okay?  So you go with him, and you're—*you know that Joaquin is going [sic] maybe jump on somebody and beat the shit out of somebody.*  And just say you're driving the car, and Joaquin gets out and he shoots somebody, and you're driving that car, alright? *You could be tried for murder.  You could be tried as being part of the murder because you would be a principle [sic] in the murder, or you could be tried as an accessory to the murder, which means you helped somebody in___.*

Varela:        I ain't helped nobody do shit.

Inspector:     Huh?

Varela:        I ain't helped nobody do nothing.

Inspector:     Alright.—

Varela:        I know what you're getting at. Why don't you get to the point? . . . so we can get it over with.

Inspector:     Okay, why don't we get to the point. We brought you down here—we know what went on in that alley, okay? Pretty much. Whether you realized it or not when you came down the alley the first time in your car you messed up the left front fender—no, listen to me.

Varela:        There's plenty of Monte Carlos___

Inspector: Alright, well,— alright, we've talked to some people, okay?  Okay. There were two people sitting there in that alley.  Two guys, okay?  And they saw. . . .
*You got yourself into a situation, you know, and we know you didn't do it.  But if you're going to continue to sit in here and lie and cover up for Joaquin, you're going to be in some deep shit, because we know*—we don't speak Spanish, we know who got out of the car, we have witnesses because—see, the problem was he argued and fought out there with a guy and yelled and screamed and people came out and looked out the window.
*. . . The shit went down, it went sour, he shot, he jumped back in your car, and you drove off, and that's exactly what happened.*
*And be honest with us son.  You're only 18 years old, you've been [sic] shit as a juvenile, you don't want to get in shit as an adult. . . .*

Varela: *Alright.*

Inspector: What you ought to do is tell us exactly what happened.  No lies.  For your own good, son.  Okay? It's best for you to tell us exactly what went down.  We know you didn't do it.  We know—

Varela: I didn't know what was going to happen.  I didn't know what was going to___.  *Hey, whatever you said.*

Inspector:   I want you to tell us. *You're the one that's either in the hot seat. You're going to either be involved in this or not involved with this.* You know you just happened to be there— you know, either you're there or as a suspect—you're either there as a suspect— *we know you're there. You're either there involved in it as a suspect, or you're just there as an innocent party who happened to be there.*

Varela:      I just didn't know what was going to happen. It was like everything happened all quick. And if would have knew what was going to happen I would have told him to get in the car and went home and said fuck the whole deal and I would have been ____. *I don't know how I'm supposed to even try to cover up. Like you said, I'm going to be 18.* I damn sure I don't want to go to the can for something I didn't do. *I don't want to go.*

Inspector:   I know. You tell us exactly what happened, and how you got down there and what happened.

Varela expressed hesitation. The inspectors then offered their supposed understanding of what happened with a story that insulated Varela from liability. The officers then said, "the thing you should do right now [is] just tell us, so you don't get in shit, 'cause you're really in heavy shit, in other words, unless you tell us the truth." Varela was hesitant. Soon after, he said, "But what you're saying is, because of what went down, ___ cover me up." He then said, "Just don't—please keep me out of it." The inspectors responded,

"Alright.  [J]ust tell us what happened."  Varela asked, "Can I go home after this?"  The inspectors responded, "After we talk? Yeah."  Varela was not given *Miranda* warnings.

Varela still did not explicitly name Ciria.  Instead, he gave his account, starting with, "Okay, just like you said."  As the District Attorney's Innocence Commission concluded, Varela then recounted the night without naming any names, only later explicitly agreeing with the inspectors' assumption that Ciria was the shooter.

In recounting what happened that night, Varela could not offer many details about Ciria's involvement in the events at the motel, such as when he picked up Ciria and dropped him off at home, what brought them to the motel, or why Ciria was involved:

Inspector:  What ___, did he—did you go over his house and pick him up that night?  Did he call you and say, "Hey, come and pick me up.  We want to go somewhere."  Or ___.  Where did you meet that day?

Varela:  I talked to him. I probably had seemed off and on during the day, and somehow or another we were together, like on the way to the bar, *but to be honest with you, I can't remember whether—obviously he didn't come to my house, because I dropped him off at home.*

Inspector:  Did you go to his house and pick him that day?

| | |
|---|---|
| <u>Varela:</u> | *Think I did. Matter of fact, I had to, because that's what I took him home.* |
| <u>Inspector:</u> | You picked him up at his house. Then where did you go? |
| <u>Varela:</u> | And then that's when we were riding around at stuff. |
| <u>Inspector:</u> | What was he saying— |
| <u>Varela:</u> | *He wasn't really saying too much, man.* He was just kicking it. . . . We drove—probably went by my house first, and then we went down ___ and then everything happened. |
| | *The way I—the way I said. I can't quite remember, to be honest with you,* whether I picked [him] up at home, or whether he came to my house. Let me see. Shit, evidently I had to pick him up at home, because that's where I took him. |

The interrogation proceeded, as Varela recounted what happened based on what he saw at the scene of the murder. The inspectors then obtained a statement from Varela. That statement ended with the inspectors confirming that Varela "began to talk to [them]" because he "did not want to be considered . . . as a suspect . . . , rather than as a witness in the case."

4.

After the interview, without any additional investigation, Crowley and Gerrans shared their investigative files with a district attorney. Crowley prepared and signed an affidavit

for a search warrant for Ciria's home, which was signed by a judge. The affidavit attached to the search warrant included only Varela's statements from the interrogation as the basis for probable cause. Crowley prepared and signed an arrest warrant at the same time that he did the search warrant, but the declaration accompanying that warrant is lost. Crowley also prepared and signed a criminal complaint charging Ciria with murder and felon in possession of a firearm. Ciria maintained his innocence and never confessed.

5.

Five days after his arrest on April 19, 1990, Ciria was arraigned. At his preliminary hearing in September 1990, the Superior Court found probable cause and bound him over for trial. Ciria's trial began on February 4, 1991. During the trial, Varela testified about his interview, but the jury did not hear the portion that is the basis of Ciria's fabrication-of-evidence claim.[2] According to the District Attorney's Innocence Commission, "Varela was the prosecution's star witness at trial" and "was granted immunity in exchange for his testimony." On February 20, 1991, a jury convicted Ciria of Bastarrica's murder.

6.

On January 19, 2021, after three decades of incarceration, Ciria filed a state habeas petition challenging the validity of his conviction. The San Francisco District Attorney referred Ciria's case to its Innocence Commission,

---

[2] Ciria's trial attorney now acknowledges that it was a mistake not to include a recording of the full testimony because "[t]he jury needed to hear the police threatening Mr. Varela and specifically telling him that he was lying and covering up, not for the killer, but for Joaquin."

which unanimously found that "Ciria's conviction cannot stand" and that Ciria was "factually innocent." As to Varela's statement, the Commission found that the police "pressured Varela to implicate Ciria" and that Varela's testimony at trial was "self-serving" and "incentivized."

On April 18, 2022, the San Francisco Superior Court granted in part Ciria's state habeas petition, vacating his conviction on the ground that he presented credible new evidence of his innocence under California Penal Code § 1473(b)(3) (2022). [3] The new evidence included declarations from Denise Corretjer, Varela's sister, and Caridad Gonzalez, Varela's family friend, who each separately declared that Varela told them that Ciria did not kill Bastarrica. Varela told Corretjer that he lied because the police had pushed him to "go with the flow" because they "wanted Joaquin so bad."

Ciria was released from custody two days after the court vacated his conviction. The District Attorney moved to dismiss all charges against Ciria in the interest of justice based on a lack of sufficient evidence, and the court granted the motion.

## B. Procedural History

In November 2022, Ciria sued the City and County of San Francisco, its police department, and three of its employees—Inspector Crowley, Inspector Gerrans, and Officer Rubino—for violating his civil rights under 42

---

[3] In California, state habeas relief is available if "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." Cal. Pen. Code § 1473(b)(3) (2022) (later amended and now codified Cal. Pen. Code § 1473(b)(1)(C)).

U.S.C. § 1983 and California law.  Ciria alleged three claims under § 1983: (1) fabrication of evidence; (2) malicious prosecution; and (3) failure to disclose exculpatory evidence of rewards and incentives provided to Varela and Guevara. Ciria also alleged several state law claims.  Ciria additionally alleged municipal liability for all his claims.

On a motion to dismiss, the district court limited Ciria's recovery on his California law claims to the harm suffered prior to his arraignment.  Defendants then moved for summary judgment on Ciria's remaining federal claims, invoking qualified immunity.  The district court granted the motion in part and denied it in part, with rulings on Defendants' evidentiary objections.  Officer Rubino and the City of San Francisco and its police department prevailed on all federal claims against them.  Inspectors Crowley and Gerrans prevailed on the nondisclosure claim.  The district court, however, denied Inspectors Crowley and Gerrans qualified immunity on the § 1983 claims for fabrication of evidence and malicious prosecution.  Defendants timely appealed.

## II. Jurisdiction and Standard of Review

The denial of a defendant's motion for summary judgment based on qualified immunity is a reviewable collateral order under 28 U.S.C. § 1291.  *See Mitchell v. Forsyth*, 472 U.S. 511, 528–30 (1985); *Plumhoff v. Rickard*, 572 U.S. 765, 771–72 (2014).  "The scope of our review in this context, however, is circumscribed." *Est. of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021) (alterations and quotations omitted).  In *Johnson v. Jones*, the Supreme Court held that any "portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence

sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial . . . is not appealable." 515 U.S. 304, 313 (1995). Only the portion of a summary judgment order that turns on "the application of 'clearly established' law to a given (for appellate purposes undisputed) set of facts" is immediately appealable. *Id.*; *accord Peck v. Montoya*, 51 F.4th 877, 885 (9th Cir. 2022); *Est. of Anderson*, 985 F.3d at 731; *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018).

At this stage, our jurisdiction is limited to purely legal issues, which we review de novo. *See Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1005, 1007 (9th Cir. 2017). We must "accept the district court's determinations that there are genuine disputes of fact," *Peck*, 51 F.4th at 887, and "take, as given, the facts that the district court assumed when it denied summary judgment for a (purely legal) reason," *Est. of Lopez*, 871 F.3d at 1007 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998)). "[W]here the district court does not explicitly set out the facts that it relied upon, we undertake a review of the pretrial record only to the extent necessary to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id.* (quoting *Watkins*, 145 F.3d at 1091). Although "qualified immunity is to be determined at the earliest possible point in the litigation," "summary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." *Id.* at 1021 (quoting *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997)).

### III. Fabrication of Evidence

### A. Scope of Jurisdiction

We first clarify the scope of our jurisdiction by isolating the legal questions on appeal going to the fabrication of evidence claim. A public official sued for damages in his individual capacity is entitled to qualified immunity unless (1) "the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right," and (2) "the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).

In this case, the district court held that a reasonable jury could find: (1) the Varela interview "went beyond explaining to a witness the advantages of telling the truth"; (2) it "involved inspectors threatening an 18-year-old, who had a juvenile record" and "did not feel free to leave," "with an adult murder charge for driving a vehicle they knew was involved in the Bastarrica murder"; (3) the officers "told [Varela] exactly what information was necessary to protect himself from that adult murder charge and to, instead, serve as a witness"; (4) Varela's response to their threat was, "Hey, whatever you said"; and (5) Varela confirmed to the inspectors that "he was talking to them because he wanted to be a witness rather than a suspect." We may not revisit these factual determinations on appeal. *See Est. of Lopez*, 871 F.3d at 1007.

Our jurisdiction is thus limited to the two "purely legal issues," *id.* (citation omitted), of: (1) whether a reasonable jury could find on these facts that the inspectors fabricated evidence against Ciria; and, if so, (2) whether in 1990, the

inspectors had a fair warning that their conduct—
"threatening" Varela with a murder charge and "feeding him
the story he needed to tell to avoid it"—violated Ciria's due
process rights.

Defendants also ask us to review purely factual disputes,
which we lack jurisdiction to consider at this stage. *See Est.
of Anderson*, 985 F.3d at 731. First, we lack jurisdiction to
consider Defendants' argument that the *government* did not
fabricate evidence because even before the interrogation,
"Varela had already named Ciria as the shooter to his
girlfriend Kristina Martin." The district court determined,
because of statements made during Martin's deposition and
the fact that Martin only spoke to inspectors after Varela had
already falsely implicated Ciria, that "a reasonable jury
could conclude that Varela told Martin what to say" and that
Varela had not actually named Ciria as the shooter
beforehand. Defendants nonetheless argue that "it is not
reasonable or rational to infer from Martin's testimony that
she lied to police about what Varela said to her about the
shooting." This amounts to an appeal of the district court's
contrary evidence-sufficiency determination, and we lack
jurisdiction to entertain it. *See id.*

Second, Defendants challenge the district court's
determination that a reasonable jury could find that the
inspectors knew or should have known Varela's statement
was fabricated because "[b]y the time they interviewed
Varela, [the inspectors] already had ample evidence against
Ciria." But the district court concluded that a reasonable
jury could find that the inspectors did not have "ample
evidence" that Ciria was the shooter for various reasons,
including that key witnesses had failed to identify him and
that there had only been gossip about his involvement in the
murder. Because Defendants' challenge amounts to a fact-

related dispute over the pre-trial record, rather than a dispute over the application of law to the district court's assumed facts, we lack jurisdiction to consider it. *See Est. of Lopez*, 871 F.3d at 1007.

## B. Constitutional Violation

We next consider whether, given the facts assumed by the district court, a reasonable jury could find that Inspectors Crowley and Gerrans violated Ciria's constitutional rights. We agree with the district court that a reasonable jury could.

Ciria has a Fourteenth Amendment due process right not to be deprived of liberty as a result of evidence fabricated by a government officer. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). "To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).[4]

A plaintiff can establish the first element of a fabrication-of-evidence claim with direct evidence of fabrication, such as a "direct misquotation of witnesses in investigative reports," *id.* at 799, as well as with circumstantial evidence, such as evidence that the defendants (i) "continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent," or (ii) "used investigative techniques that were so coercive and abusive

---

[4] Defendants have not raised any arguments regarding causation and have therefore waived any challenge to the second prong. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

that they knew or should have known that those techniques would yield false information," *Devereaux*, 263 F.3d at 1076; *see also Spencer*, 857 F.3d at 799.  The key is that the plaintiff must make some showing of "dishonesty" through either direct or circumstantial evidence.  *Devereaux*, 263 F.3d at 1076.  "The *Devereaux* test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or who surreptitiously fabricates evidence by using coercive investigative methods.  These are circumstantial methods of proving deliberate falsification." *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010).

Taking the facts as the district court assumed them, and in the light most favorable to Ciria, Inspectors Crowley and Gerrans threatened an 18-year-old who was at the murder scene into adopting a story naming Ciria as the shooter; the inspectors made their story attractive by telling Varela exactly what he needed to say to avoid liability; Varela did not feel free to leave the interrogation; he was evidently going along with their version of events to avoid a murder charge; and there was minimal objective evidence that Ciria was the shooter at the time of the interrogation.  Ciria has therefore presented evidence from which a jury could reasonably conclude that Defendants used coercive or abusive tactics during Varela's interrogation to fabricate evidence against Ciria.

The dissent characterizes Varela's interview as involving only "standard interrogation methods."  This approach, however, disregards our jurisdictional limitations.  As discussed above, *see supra* Sections II & III.A, we may not revisit the district court's determinations that a reasonable jury could find the interview "went beyond explaining . . . the advantages of telling the truth" and

"involved inspectors threatening an 18-year-old" who "did not feel free to leave," "with an adult murder charge for driving a vehicle they knew was involved in the Bastarrica murder." *Est. of Lopez*, 871 F.3d at 1007. And while the dissent suggests "*Varela* provided an account of the shooting that implicated Ciria," we lack jurisdiction to reconsider the district court's determination that a reasonable jury could find after threatening Varela, the officers "fe[d] him the story he needed to tell to avoid" a murder charge, to which Varela acceded, "Hey, whatever you said." These factual characterizations are beyond the scope of our review. Instead, the "purely legal issue[]" we have jurisdiction to review is whether a reasonable jury could find that these assumed facts amount to a constitutional violation. *Id*. We decline the dissent's invitation to weigh the evidence presented by Ciria. That is a task for the jury.

Importantly, Ciria does not merely argue that the inspectors used "improper" techniques or techniques that "violated state regulations." *Devereaux*, 263 F.3d at 1075 (holding that the use of such techniques, without more, is insufficient). Rather, he has presented evidence that the inspectors "knew or should have known [their] interview tactics would yield false information." *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003). This provides the requisite circumstantial evidence of "dishonesty." *Devereaux*, 263 F.3d 1076.

For example, a reasonable jury could find that during their interrogation, Defendants faced numerous indicia that Varela was not providing a truthful account of what happened but was merely repeating what the inspectors wanted him to say. A reasonable jury could find that despite this, Defendants continued to threaten Varela and offered him a story insulating him from liability so that they could

obtain a statement naming Ciria as the shooter. As the district court explained, and as the assumed facts show, Defendants told Varela that he could be liable for murder if he continued to "cover up for [Ciria]":

Inspector:    Alright, well,— alright, we've talked to some people, okay? Okay. There were two people sitting there in that alley. Two guys, okay? And they saw. . . .

*You got yourself into a situation, you know, and we know you didn't do it. But if you're going to continue to sit in here and lie and cover up for Joaquin, you're going to be in some deep shit, because we know*—we don't speak Spanish, we know who got out of the car, we have witnesses because—see, the problem was he argued and fought out there with a guy and yelled and screamed and people came out and looked out the window. . . . *The shit went down, it went sour, he shot, he jumped back in your car, and you drove off, and that's exactly what happened.*

*And be honest with us son. You're only 18 years old, you've been [sic] shit as a juvenile, you don't want to get in shit as an adult.*

Defendants again asked Varela what happened, telling him that they knew he did nothing wrong; in response, Varela said, "*Hey, whatever you said.*"

After one of the inspectors said, "You're going to either be involved in this or not involved in this," Varela replied,

"*I don't know how I'm supposed to even try to cover up. Like you said, I'm going to be 18.*"  And after an inspector said Varela could go home only after talking to them, and without giving him *Miranda* warnings, one of the inspectors again asked what happened, and Varela responded, "*Okay, just like you said.*"  Throughout the interrogation, Varela sought assurances that compliance with Defendants' wishes would keep him out of trouble, and Varela struggled to provide details about Ciria's involvement in the events at the murder scene.

As the district court determined, a reasonable jury could find that Varela, scared by the threat of serious criminal liability, was adopting the story Defendants fed him.  The jury could reasonably find that this story implicating Ciria was not backed by objective evidence of Ciria's guilt and was elicited through threats of criminal prosecution against a young witness.  And the jury could reasonably find that, despite the indicia that Varela was merely repeating what Defendants wanted him to say, Defendants used Varela's statement to charge Ciria with murder.  Defendants never attempted to corroborate Varela's story or ask anyone about Varela's credibility.

Our holding in *Gantt*, where we determined that there was sufficient evidence to submit the fabrication-of-evidence claim to the jury, confirms that the factual circumstances here present a triable question for the jury.  717 F.3d at 708.  In *Gantt*, the essence of the plaintiffs' claim was that Rosemond, another suspect, falsely implicated the plaintiffs due to police pressure.  The key evidence was that Rosemond "testified that the detectives threatened to charge him with murder if he did not provide information."  *Id.* Rosemond testified that the officers told him "if [he] didn't give them something, that [he] would go down for it."  *Id.* at

704. In addition to this testimony, we noted some of the "manner and circumstances" of Rosemond's interrogation—the officers allegedly told him not to tell anyone they showed him certain materials, and even though the officers "did not think Rosemond was still under the influence during the interrogation," Rosemond testified that he "had been awake for approximately two days straight on a crack binge, and was in fact still high when he made his identifications." *Id.* at 708.

The crux of the fabrication claims here and in *Gantt*—threatening a witness with criminal liability unless he agreed to the officers' story—is the same, and any factual differences between the cases are not legally meaningful. While Defendants point out that Rosemond's interrogation lasted four to six hours a day for multiple days, *see id.* at 704, this fact was plainly not dispositive, as we never mentioned it in explaining our decision, *see id.* at 708.

Additionally, a jury could reasonably find facts that would make Ciria's fabrication-of-evidence claim even stronger. As the district court noted, Varela, at only 18 years old, was a teenager who was at the scene of the murder, making an adult murder charge with a life sentence especially daunting. Moreover, while Rosemond was only threatened to provide "information," *id.* at 704, the inspectors offered Varela an enticing story that specifically named Ciria as the shooter. As the district court further noted, a jury could also reasonably find that Varela did not feel free to leave the interrogation. By withholding *Miranda* warnings from him, a jury could reasonably conclude that the inspectors increased the pressure on Varela to agree with whatever they said, as Varela was not made aware of his right to remain silent or to speak to an attorney in the face of their interrogation.

The Sixth Circuit, which relies on a framework for fabrication-of-evidence claims similar to ours, recently held that a jury could conclude that inspectors fabricated evidence under similar circumstances, where: (1) the witness repeatedly denied knowing anything about the crime; (2) the witness told inconsistent stories; (3) the defendants were aware of an alibi witness for the named suspect; and (4) the defendants pressured the witness into giving a statement by threatening to take away her children. *See Clark v. Abdallah*, 131 F.4th 432, 448 (6th Cir. 2025). The Sixth Circuit concluded that there was "no legal reason why the combination of factors presented here could not support a jury verdict in [the plaintiffs'] favor." *Id.* at 449.

Defendants appeal to three types of cases to argue that, as a matter of law, the assumed facts do not make out a constitutional violation: first, they point to distinguishable fabrication-of-evidence cases; second, they point to cases about unconstitutional interrogations under the Fifth and Fourteenth Amendments; finally, they point to cases resolved under the legal standard for dismissing indictments on due process grounds. None of these cases affect our holding.

1.

Defendants argue that because the plaintiffs in *Devereaux,* 263 F.3d 1070, and *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003), failed to present triable fabrication-of-evidence claims, Ciria's claim necessarily fails. But both cases are readily distinguished.

In *Devereaux*, a fabrication-of-evidence claim failed where an officer confronted A.R., a minor, about her recanting her allegations against Devereaux. 263 F.3d at 1078. The officer threatened her with charges for "false

reporting" if she stuck to her recantation. *Id.* Importantly, the claim did not fail because this tactic was not coercive—rather, we recognized that the officer employed a "coercive technique" and referenced the "coercive nature of the threat." *Id.* The claim failed because A.R. stuck to her recantation, so the threat "did not . . . yield any false testimony." *Id. Devereaux* therefore held that "*unsuccessfully*" applying pressure cannot support a fabrication-of-evidence claim, while nonetheless acknowledging the coercive nature of a threat to file charges against a vulnerable witness. *Id.* (emphasis in original). Here, by contrast, the pressure was successful, or at least a reasonable jury could so find in light of Varela's comments.

*Cunningham* is also distinguishable. There, we concluded that a fabrication-of-evidence claim failed where an investigator "kept questioning the [accused's] daughters after they initially denied the sex abuse" and "may have also told [one of the daughters] that she could not leave [the hospital] until she confessed to the abuse." 345 F.3d at 812. First, threatening an 18-year-old with an adult murder charge is more analogous to telling someone he would go "down for murder" if he did not give the officers "information" (which created a triable issue for the jury in *Gantt*, 717 F.3d at 708) or threatening a child with false reporting charges (which was considered coercive in *Devereaux*, 263 F.3d at 1078).

Second, the officer in *Cunningham* faced distinguishable circumstances in his investigation. Notably, one daughter had previously claimed that her father sexually abused her and was now denying it, and Cunningham had confessed to the abuse. *See* 345 F.3d at 805–06. Because Cunningham's daughters "did not immediately corroborate the confession," and one had even backtracked from her earlier claim, the police "kept questioning" them, and the daughters eventually

implicated their father. *Id.* at 811–12. Here, however, Varela had never backtracked from claiming Ciria was the shooter, nor had Ciria confessed. Rather, Varela had corroborated Ciria's alibi, and Ciria maintained his innocence.

Given the context of the investigation, there was ultimately no evidence in *Cunningham* that the officer knew or should have known that when the daughters implicated their father, they were lying in response to his tactics. Absent any "independent evidence that [the officer] knew or should have known his interview tactics would yield false information," *Gausvik*, 345 F.3d at 817, we held that repeated questioning amounted at most to an "improper interview technique[]." *Cunningham*, 345 F.3d at 812. By contrast, here, as the district court determined, a reasonable jury could find that the inspectors were aware or should have been aware that Varela was not being truthful and was merely adopting Defendants' account of events in response to police pressure. *Cunningham*, therefore, creates no legal obstacle to presenting this case to a jury.

## 2.

Defendants next rely on the fact that many of the techniques the inspectors used were constitutional under the Fifth Amendment and Fourteenth Amendment standards for involuntary confessions. In such contexts, they argue, continuing to question a suspect after he claims he is innocent, accusing a suspect of lying, explaining potential criminal liability, or explaining the advantages of telling the truth do not automatically render a confession involuntary. This argument fails for several reasons.

First, "it may be true that application of each of these tactics would not render the witness's statement

constitutionally involuntary," but "it does not follow that when an officer uses these tactics together, he could not infer that the witness's story was false or at least highly unreliable." *Clark*, 131 F.4th at 450 (emphasis omitted). Whether officers violated someone's constitutionally-protected right against self-incrimination is a separate question from whether they used coercive or abusive tactics to elicit a fabricated statement against someone. The latter is the essence of a fabrication-of-evidence claim. An officer can fabricate evidence by pressuring a witness to make a false statement, even without violating that witness's constitutional right. After all, coercing someone into incriminating themselves would typically require an even higher level of coercion than coercing someone into incriminating someone else. The "critical element" of a fabrication of evidence claim is not whether use of the tactics alone would be constitutional against the interrogated witness but whether "the defendants . . . knew or should have known that they were eliciting false accusations" against the eventual defendant. *Devereaux*, 263 F.3d at 1076 (citation omitted). Thus, even if the inspectors' tactics did not violate Varela's Fifth Amendment right, it does not follow that the inspectors did not fabricate evidence against Ciria.

Defendants' reliance on cases from the Fourteenth Amendment involuntary confession context is similarly misplaced. *See, e.g.*, *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009). It is irrelevant whether Varela's substantive due process rights under the Fourteenth Amendment were violated by the inspectors' interrogation. Ciria's claim is that the conduct that shocks the conscience is not what the inspectors did to Varela, but what they did to *him*—specifically, that the inspectors used abusive tactics to produce a statement against him and then used that statement

to charge him with murder, acting with deliberate indifference to or with reckless disregard towards his right not to be charged with fabricated evidence. *See Gantt*, 717 F.3d at 707–08.

Unsurprisingly, we never held in *Devereaux* that fabrication-of-evidence claims only arise when the underlying interrogation violates the constitutional rights of the person being questioned. Confirming this point, Defendants cannot identify any case that has applied Fifth or Fourteenth Amendment involuntary confession standards to the fabrication-of-evidence context.

Furthermore, even if cases from the Fifth Amendment context were informative regarding the type of tactics that produce unreliable statements, Defendants' tactics, at least when viewed in the light most favorable to Ciria, would still qualify as coercive. We have recognized that "threats" constitute a coercive interrogation technique and that confessions made in a coercive manner are "likely to be unreliable." *United States v. Tingle*, 658 F.2d 1332, 1334–35 (9th Cir. 1981). At this stage, we take as given that that the inspectors threatened Varela with criminal liability.

None of the cases Defendants point to permit officers to use threats. For example, in *People v. Andersen*, 161 Cal. Rptr. 707, 715 (Cal. Ct. App. 1980), although the court held that there was "nothing wrong in the statements made by the police officers to the interviewee urging her to tell the truth," that was because "the admonition to tell the truth was appropriate and timely and not one extraneously dragged in as a club with which to bully the suspect." *Id.*. Likewise, in *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 n.2 (9th Cir. 1988), we observed that while officers may incentivize cooperation by promising to tell prosecutors if a

witness cooperates, they may not threaten someone to adopt a particular statement.

Regardless, the essence of a fabrication-of-evidence claim is not the constitutionality of the techniques as applied to the person being questioned—in this case, Varela—but whether there is "independent evidence that [the officers] knew or should have known [their] interview tactics would yield false information." *Gausvik*, 345 F.3d at 817; *see Devereaux*, 263 F.3d at 1078. Defendants have not pointed us to any authority—nor could we find any—for their proposition that there can be no fabrication of evidence if the interview did not violate the witness's constitutional rights.

3.

Finally, Defendants cite cases in which this court has declined to dismiss an indictment on due process grounds. *See, e.g.*, *United States v. Ryan*, 548 F.2d 782 (9th Cir. 1976). In *Ryan*, we declined to dismiss an indictment on due process grounds where officers secured an informant's cooperation through assertions that the informant would go to jail if he refused to cooperate, "[p]rophecies that his health would suffer irreparably if he went to jail," and "[a]ssurances that his friends . . . would be kept 'out of it.'" *Id.* at 789. Defendants argue that the inspectors' tactics here are less coercive or at least comparable to the practices in *Ryan*, so they do not amount to fabrication of evidence.

*Ryan* has little relevance here. First, *Ryan* involves an informant's consent to have his conversations with a suspect recorded. *Id.* at 785, 789. Concerns regarding the officers' techniques producing *false* information were never raised and would naturally be far less salient in those circumstances, since the government sought the informant's willingness to be recorded when talking to a suspect, not the

adoption of a specific statement implicating someone. *Id.* at 786.

Second, in *Ryan*, the issue before us was whether an indictment should be dismissed on due process grounds. That involves a high standard not found in the context of fabrication-of-evidence claims brought under § 1983: the government conduct must be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 788 (citation omitted). There is no basis in our precedent to graft this standard onto our analysis of fabrication-of-evidence claims under § 1983. *See Gantt*, 717 F.3d at 707–08 (explaining the legal standard for fabrication-of-evidence claims).

Finally, even if the facts and legal standard in *Ryan* were relevant here, the case's procedural posture makes it inapposite. In considering whether the informant's consent was voluntary under these circumstances, we were reviewing the trial court's factual determination for clear error. *Ryan*, 548 F.2d at 791. That is a distinct legal inquiry from the one here, which is whether any reasonable jury could find that the inspectors used coercive and abusive tactics to produce a false statement against Ciria.

In sum, we are not persuaded by any of the cases Defendants raise that there can be no constitutional violation on these facts. Under our precedents and based on the assumed facts, a reasonable jury could find that the inspectors were deliberately indifferent or exhibited reckless disregard towards Ciria's right not to be charged based on fabricated evidence. A reasonable jury could also find that the inspectors fabricated evidence against Ciria by using interrogation tactics including threatening Varela with an

adult murder charge and offering him a story that exculpated him to get him to name Ciria as the shooter.  Finally, given the context of the full investigation and comments Varela made during the interrogation, a reasonable jury could find that the inspectors knew or should have known Varela was not telling the truth but merely adopting the fabricated story they fed him.

## C. Clearly Established Law

We consider next whether Defendants are nonetheless entitled to qualified immunity at this stage because the law was not clearly established at the time of the events in question.  We conclude that they are not.

Even if he violated a constitutional right, a public official sued for damages in his individual capacity is entitled to qualified immunity unless "the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn*, 949 F.3d at 1174.  "There need not be a case directly on point for a right to be clearly established."  *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019).  "The 'salient question . . . is whether the state of the law' at the time of their misconduct" gave the officers "'fair warning that their [misconduct] was unconstitutional.'"  *Rieman v. Vazquez*, 96 F.4th 1085, 1094 (9th Cir. 2024) (alteration in original) (quoting *Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017)).  The constitutional question must be "beyond debate."  *Hardwick*, 844 F.3d at 1117.

As discussed above, a reasonable jury could find that Defendants used abusive tactics to feed Varela a story naming Ciria as a shooter.  A reasonable jury could also find that Defendants used Varela's statement to charge Ciria with

murder, even though they knew or should have known based on their investigation and Varela's responses that Varela was merely adopting the story they fed him. The relevant question at this juncture is whether, assuming these facts as we must, it was clearly established in 1990 that such conduct would violate Ciria's due process rights. We hold that it was. Defendants, of course, emphasize that they never threatened Varela and that they had no reason to know Varela's statement was not truthful. But those are factual issues for the jury to resolve, not us. In any case, we lack jurisdiction to review the district court's contrary factual determinations on those points.

Several authorities put the constitutional question "beyond debate." *Id.* As an initial matter, there is no dispute that in 1990, "there [was] a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux*, 263 F.3d at 1074–75. Although *Devereaux* was only published in 2001, Defendants do not dispute that this due process right was clearly established in 1990, at the time of Varela's interrogation. Indeed, *Devereaux* observed that a right not to be charged based on fabricated evidence was "virtually self-evident," even without a prior case on point. *Id.* at 1075; *see also Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) (holding that it is "self-evident" that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit").

Even if it were not obvious, an array of Supreme Court cases confirm Ciria's constitutional right not to be charged with deliberately fabricated evidence. In *Miller v. Pate*, the Supreme Court emphasized the "established principle" that

the "Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." 386 U.S. 1, 7 (1967). Even earlier, *Pyle v. Kansas*, 317 U.S. 213, 216 (1942), established that the knowing use of perjured testimony to secure a criminal conviction violates the accused's constitutional due process rights. *Pyle* emphasized that public officials may not coerce and threaten witnesses to testify falsely against a suspect. *Id.* at 214–15. In addition to finding the "wrongfulness of charging someone on the basis of deliberately fabricated evidence . . . sufficiently obvious," *Devereaux* held that "*Pyle* is sufficiently analogous" to a "right to be free from such charges." 263 F.3d at 1075; *see also Halsey v. Pfeiffer*, 750 F.3d 273, 296 (3d Cir. 2014).

We also conclude that, as a necessary corollary to this general prohibition, it would have been clear to any reasonable official in Defendants' shoes that they could not use coercive and abusive interrogation tactics to get a witness to adopt a story they knew or should have known was fabricated. After all, any reasonable officer would know that if he uses certain interrogation tactics to get a witness to adopt a fabricated statement, he has fabricated evidence against the accused person, whether directly or surreptitiously. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (emphasizing that "general statements of the law are not inherently incapable of giving fair and clear warning" and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" (citation omitted)). Therefore, even in 1990, it was beyond debate that using interrogation tactics to feed Varela a fabricated story naming Ciria constituted fabricating evidence and that fabricating evidence violated Ciria's constitutional rights. *See also*

*Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019).

If that were not enough, as Defendants claim, *Pyle* confirms that Defendants had a further warning that their tactic—threatening a witness with criminal liability—is one way to elicit false testimony. *See Pyle*, 317 U.S. at 215. In *Pyle*, the Supreme Court held that Pyle "set forth allegations that his imprisonment resulted from perjured testimony" when one witness alleged that he was threatened with a penitentiary sentence for burglary if he did not testify falsely against Pyle and that another was threatened with prosecution unless he testified for the State. *Id.* at 214–216. *Pyle* therefore "confirms what common sense dictates," *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 978 (9th Cir. 2025), that threatening a witness with criminal liability to elicit a false statement against the accused violates the accused person's rights.

Given this array of authorities solidifying the principle, and because the proposition is self-evident, any reasonable officer would know that threatening a young witness and offering him a story that insulates him from liability to get him to falsely implicate a suspect violates the accused suspect's due process rights. Defendants dispute that they threatened or intimidated Varela, or that the officers knew or should have known that Varela's statement was not truthful, but these are factual questions for the jury to resolve. As the district court determined, a reasonable jury could find that the inspectors threatened and pressured Varela, who was evidently susceptible to intimidation, into adopting a fabricated story that the inspectors fed him. As we must, we assume these factual determinations are true. Because even in 1990, it was clearly established that such conduct would

violate Ciria's rights, qualified immunity is improper at this stage.

## IV. Malicious Prosecution Claim

We next analyze Ciria's malicious prosecution claim. The elements of a malicious prosecution claim under § 1983 derive from the state law elements of malicious prosecution. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561–62 (9th Cir. 1987). To prevail on a § 1983 claim of malicious prosecution in California, a plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (alterations in original) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).[5]

To sustain a malicious prosecution claim, Ciria must also show the absence of probable cause. *See Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). "The probable cause inquiry is objective, asking whether a reasonable person would have thought that the claim was legally tenable." *Est. of Tucker ex rel. Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1031 (9th Cir. 2008). The

---

[5] Because no freestanding "substantive due process right exists under the Fourteenth Amendment to be free from malicious prosecution," to bring a malicious prosecution claim under § 1983, Ciria must point to *another* constitutional right that Defendants violated in prosecuting him. *Awabdy*, 368 F.3d at 1069. The district court recognized this constitutional right as the right not to be charged based on fabricated evidence under the Fourteenth Amendment. Defendants do not challenge that determination.

probable cause determination is the focus of Defendants' appeal.

On appeal, Defendants argue that (1) the district court erred in focusing solely on the four corners of the search warrant affidavit (produced at the same time as the arrest warrant and draft of the Criminal Complaint), rather than everything the inspectors knew at the time they charged Ciria; (2) even excluding Varela's statement implicating Ciria, probable cause existed to charge Ciria with murder; and (3) even if probable cause did not exist to charge Ciria, the existence of probable cause was reasonably arguable, so Defendants are entitled to qualified immunity on the malicious prosecution claim.

## A. Constitutional Violation

To begin, we agree with Defendants that we are not limited to the contents of the affidavit that accompanied the inspectors' search warrant in analyzing whether Defendants had probable cause to charge Ciria.[6] Crowley declared that after he interviewed Varela, and before he signed the Criminal Complaint against Ciria, he and Gerrans met with the Assistant District Attorney assigned to the case, shared the full investigative file with him, and discussed the investigation. We therefore consider the totality of the circumstances known to the inspectors at the time they signed the Criminal Complaint.

Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent

---

[6] Where the scope of the officers' knowledge is uncertain on the record, as here, the affidavit may nonetheless be evidence of what information the officers found sufficiently credible to attest to and present to a magistrate.

person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). The totality of the evidence shows only that Ciria looked somewhat like the shooter and was involved in drug dealing with Bastarrica and other Cuban people in the area. There was no physical evidence linking Ciria to the crime. There was no match between what Ciria had been wearing an hour before the murder (at Galan's Bar) and the distinctive trench coat that the shooter wore and was specifically noted by two eyewitnesses. No one had placed him near the scene of the murder that night. Neither eyewitness could positively identify Ciria as the shooter. He also had an unverified alibi. Moreover, Ciria was willing to talk to the inspectors and take a polygraph test; he made no attempt to flee. And Defendants knew of at least one other person who knew Bastarrica and that matched the description of the shooter, but they did not seek him out for further investigation. Considering this evidence as a whole, viewed in the light most favorable to Ciria, a reasonable jury could find that there was less than a "fair probability" that Ciria was the shooter. *Id.*

First, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough" to provide probable cause. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984). Mercedes Mora's and Charles Austin's statements about what people had been saying about the identity of the shooter cannot help Defendants. Statements about the "word" in the community are clearly rumors, and the officers had no idea what the bases of those statements were. *See id.* at 1009 (holding that officers could not rely on suspicions of a witness who "had no personal knowledge" and whose suspicions were not confirmed by objective evidence); *see*

*also United States v. Freitas*, 716 F.2d 1216, 1222 (9th Cir. 1983). Among the credible new evidence of Ciria's innocence identified by the Innocence Commission, it was the person named by Socorro as the actual shooter, Candido, who spread the rumors about the shooting to cast suspicion onto Ciria. Likewise, there is no evidence regarding the basis for Austin's and Mora's belief that Ciria had a falling out with Bastarrica, and, viewing the evidence in the light most favorable to Ciria, a jury could reasonably find that this was an accompanying rumor. Indeed, no one linked Ciria to the scene of Bastarrica's murder, and no witness placed him at Alfonso's murder the night before.

Second, the evidence regarding Ciria's match to the physical description of the shooter was weak. Guevara viewed the shooting only from above. She could not see the shooter's face, and she said she was not sure about his height and weight. Duff witnessed the shooting from around thirty feet away, and his descriptions were both general and changed a bit over time, in height (from 5'10"–5'11" to almost 6'0"), age (from late 30s to no older than early 30s), and race (including Middle Eastern or Iranian, Hindu, and Black).

Although general physical descriptions can be relevant, *see United States v. Pinion*, 800 F.2d 976, 979 (9th Cir. 1986), they are not sufficient. We have repeatedly observed that "mere resemblance to a general description is not enough to establish probable cause." *Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002); *accord Torres v. City of Los Angeles*, 548 F.3d 1197, 1208 (9th Cir. 2008); *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007); *see also United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990).

There were also key and "more specific aspects" of the description that were missing, such as the distinctive trench coat worn by the shooter. *Lopez*, 482 F.3d at 1073; *see also Torres*, 548 F.3d at 1208. The inspectors should have known that Ciria had not been wearing the dark trench coat that both witnesses observed the shooter wearing that night. Tellingly, as the inspectors have admitted, the eyewitnesses whose physical descriptions they relied on could not positively identify Ciria as the shooter. *See Lopez*, 482 F.3d at 1074 ("The effect of evidence which may support, or incline toward, a finding of probable cause can, of course, be vitiated by countervailing evidence."); *see also Torres*, 548 F.3d at 1209 (describing an unreliable comparative identification). There was additionally no physical evidence linking Ciria to the murder scene.

Finally, Ciria made "no attempt to flee" and instead voluntarily offered to talk to the inspectors. *Torres*, 548 F.3d at 1209. Further, Ciria had an alibi, which the officers never attempted to verify before charging him with murder. *See also Gilker v. Baker*, 576 F.2d 245, 247 (9th Cir. 1978) ("His explanation lent itself to verification which apparently was never sought.").

As a whole, when viewed in the light most favorable to Ciria, this case involves evidence similar in strength and in type to *McKenzie*, 738 F.2d at 1006–10: rumor and suspicions not based on objective evidence, an imperfect match to a general physical description, some circumstantial evidence linking the suspect to the crime but no physical evidence, and a failed identification from a key witness. These circumstances did not establish probable cause in *McKenzie*, and they do not establish probable cause here. Defendants make no other argument challenging the district court's determination that Ciria has a triable malicious

prosecution claim. We thus agree with the district court, although for different reasons, that a reasonable jury could find that the inspectors lacked probable cause that Ciria was the murderer, and accordingly, that Ciria—if Defendants are not immune—has a viable malicious prosecution claim.

## B. Clearly Established Law

We next consider whether Defendants are entitled to qualified immunity on the malicious prosecution claim. Malicious prosecution claims based on a violation of a constitutional right were actionable under § 1983 in 1990, as they are now. *See Usher*, 828 F.2d at 562; *Cline v. Brusett*, 661 F.2d 108, 112 (9th Cir. 1981); *see also Malley v. Briggs*, 475 U.S. 335, 340–41 (1986) ("In 1871, the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause."). It was also clearly established in 1990 that a malicious prosecution claim may be brought not only against prosecutors but also against others, including police officers, who wrongfully caused prosecution. *See, e.g.*, *Usher*, 828 F.2d at 562.

Malicious prosecution claims require a lack of probable cause. Probable cause "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (quoting *Lopez*, 482 F.3d at 1072); *see also Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). While not a "high bar," probable cause requires a "substantial chance of criminal activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57, 61 (2018) (quoting *Kaley v. United States*, 571 U.S.

320, 338 (2014) and *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

In applying qualified immunity analysis to claims of a lack of probable cause, we consider "whether it is *reasonably arguable* that there was probable cause." *Johnson v. Barr*, 79 F.4th 996, 1005 (9th Cir. 2023) (emphasis in original) (quoting *Rosenbaum*, 663 F.3d at 1076). "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby,* 583 U.S. at 64 (citation omitted). But in an "obvious case," the "unlawfulness of the officer's conduct" may be "sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (citation omitted).

Viewing the facts in the light most favorable to Ciria, it is not reasonably arguable that the officers had probable cause to arrest Ciria and charge him with murder. As the district court observed, outside of Varela's statements, "much of the other cited evidence and witness interviews were not based on personal knowledge, and, instead, are more akin to gossip or rumor." It was clearly established in 1990 that "[m]ere suspicion" and "common rumor" cannot provide probable cause. *McKenzie*, 738 F.2d at 1008; *see Freitas*, 716 F.2d at 1222 (discounting assertions where there was "no assurance that [the] source had gathered his information from personal observation rather than 'casual rumor'"). Similarly, the physical descriptions offered by eyewitnesses were weak, inconsistent, and highly generic. And at the time of the relevant events, it was clearly established that "mere resemblance to a general description is not enough to establish probable cause." *Grant*, 315 F.3d at 1088; *see also Ricardo D.*, 912 F.2d at 342; *Pinion*, 800

F.2d at 979 (explaining that a match to a "general" description is "insufficient to establish probable cause").

The "state of the law" in 1990 thus gave the officers "fair warning" that they lacked probable cause to arrest and charge Ciria with first-degree murder. *Hope,* 536 U.S. at 741.

This is not a case where "reasonable officers could disagree as to the legality of [Ciria's] arrest." *Rosenbaum,* 663 F.3d at 1076. Tellingly, the inspectors relied exclusively on Varela's statements as the basis for probable cause in the search warrant affidavit, and as we have explained, a reasonable jury could find that the inspectors coerced Varela into producing those false statements. In their attempt to demonstrate probable cause before the magistrate, the inspectors did not include the "word" in the community, "common rumor" about Ciria's relationship with Bastarrica, or even the imperfect match to a physical description of the shooter. *McKenzie*, 738 F.2d at 1008. Defendants' entitlement to qualified immunity rises and falls with this same evidence. Like the arresting officers who declined to rely on this weak evidence when seeking a search warrant, it is clear to us that this evidence is insufficient to render it "*reasonably*" arguable that there was probable cause. *Rosenbaum*, 663 F.3d at 1076.

Not only was it clearly established that rumor and a weak match to a general description were insufficient for probable cause, the unlawfulness of the Defendants' conduct should also have been "obvious." *Wesby*, 583 U.S. at 64. Officers do not need a case on point to know that it is unlawful to charge first-degree murder principally on the basis of a single coerced and false statement, particularly when the

only other available evidence is rumor and a weak match to a generic physical description.

The cases Defendants cite are inapposite.  Defendants invoke three cases to argue that a match to a detailed physical description provided by eyewitnesses and a close connection with a vehicle linked to the crime are sufficient for probable cause.  *See United States v. Gaines*, 563 F.2d 1352, 1358 (9th Cir. 1977); *United States v. Barnett*, 423 F.2d 694, 694 (9th Cir. 1970); *Hollins v. United States*, 338 F.2d 227, 229 (9th Cir. 1964).  But in each of these cases, there was probable cause because the suspect in question actually matched the description provided by witnesses *and* was directly connected to the vehicle associated with the crime.

For example, in *Gaines*, physical descriptions of the robbery suspects matched the occupants of the vehicle "which was unquestionably linked to the bank robbery."  563 F.2d at 1358.  Importantly, because Gaines had also acknowledged to the officer that he and his girlfriend had "sole" use of the vehicle and he had possession of it when the robberies were committed, we concluded that the officers possessed adequate information to take Gaines into custody. *Id*.

Similarly, there was probable cause to arrest Barnett because he matched the physical description of the robber, the officers knew his name and address based on the license plate on the getaway car, and he had approached the known address and identified himself by name.  423 F.2d at 694. Finally, in *Hollins*, the officer had a litany of "trustworthy information" amounting to probable cause.  338 F.2d at 229. Hollins's "generally similar" match to a physical description of the suspect was only a part of our analysis.  *Id*.  The officer also had reliable information that the bank had been robbed

around an hour before and that the robber had fled in a car with the same make, description, and license plate as the car parked in the driveway of the home where Hollins lived and answered the door. *Id.* The officer even observed that the car parked in the driveway was "still warm" when he arrived, demonstrating a strong connection between the vehicle, the suspect, and the crime. *Id.*

These cases show that it was unreasonable for the officers to believe they had probable cause in this case. Construing the facts in the light most favorable to Ciria, there was an absence of knowledge or "trustworthy information" sufficient to lead a reasonable officer to "believ[e] that [Ciria] had committed . . . an offense." *Beck*, 379 U.S. at 91; *see also Lopez*, 482 F.3d at 1072. To reiterate, the evidence regarding Ciria's match to the general physical description of the shooter was weak. Eyewitnesses could not positively identify Ciria as the shooter. And importantly, evidence that undermined this match was missing, such as the distinctive trench coat two eyewitnesses said that the shooter wore on the night of the murder. With respect to the vehicle, Ciria did not own the Monte Carlo; the officers knew it belonged to Varela. No one connected Ciria to the vehicle at the time of the shooting. No one even placed him near the scene of the murder that night. He had an unverified alibi. There was no physical evidence linking him to the murder. And the officers knew that the only concrete piece of evidence they had linking Ciria to the murder was a statement that *they fabricated*.

"[C]onsidering all of the surrounding circumstances," it is not reasonably arguable that the officers had probable cause to arrest Ciria. *Wesby,* 583 U.S. at 61 (citation omitted). Under these circumstances, Defendants are not

entitled to qualified immunity on Ciria's malicious prosecution claim.

**AFFIRMED.**

Defendants shall bear all costs on appeal.

---

MILLER, Circuit Judge, dissenting:

Joaquin Ciria spent many years in prison based on a murder conviction that has now been vacated, so it is natural to think that he should be compensated. But this case does not present the abstract question whether Ciria is entitled to some form of compensation. Instead, it presents a more specific legal question: whether James Crowley and Arthur Gerrans, the two police officers who investigated Ciria, are subject to liability under 42 U.S.C. § 1983 for fabrication of evidence and malicious prosecution.

Officers are shielded from civil liability under section 1983 unless a plaintiff establishes that their conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). First, the plaintiff must show "a violation of a constitutional right." *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1218 (9th Cir. 2015). Second, that right must be "'clearly established' at the time of the alleged misconduct." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (citation omitted). Instead, we must focus on "whether the violative nature of *particular conduct*

is clearly established." *Id.* (emphasis added). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *accord Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004). Thus, except in an "obvious case," a plaintiff seeking to overcome an assertion of qualified immunity "must identify a case that put [the defendant] on notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam).

Both of Ciria's claims fail because, even assuming that the officers violated Ciria's constitutional rights, Ciria cannot show that the relevant rights were clearly established at the time of the investigation in March 1990. I would therefore reverse the district court's order denying the officers' motion to dismiss.

## I

Ciria's fabrication-of-evidence claim rests on the officers' interview with George Varela, a witness who named Ciria as the shooter in the murder for which he was ultimately convicted. The record shows that the officers first explained "how the law works" by telling Varela that if he drove Ciria to the crime scene and Ciria shot someone, then Varela "could be tried as being a part of the murder . . . or [he] could be tried as an accessory to the murder." Varela responded by denying involvement: "I ain't helped nobody do nothing." The officers then told Varela that they spoke to eyewitnesses who "saw the driver." They added that Varela had "got [himself] into a situation" and that if he was "going to continue to sit in here and lie and cover up for Joaquin [Ciria], [he was] going to be in" legal jeopardy. The officers cautioned Varela to "be honest," noting that he was 18 years

old, had been in trouble as a juvenile, and did not want to get in trouble as an adult. They added: "What you ought to do is tell us exactly what happened. No lies. For your own good, son. Okay? It's best for you to tell us exactly what went down. We know you didn't do it." Soon after that exchange, Varela provided an account of the shooting that implicated Ciria.

Ciria alleges that the techniques used to interview Varela were "so coercive and abusive that [the officers] knew or should have known that those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). Even assuming that the interview violated the rule we announced in *Devereaux* more than a decade after the interview took place, this is hardly a case in which the constitutional violation was "obvious" at the time. *Cf. Hope v. Pelzer*, 536 U.S. 730, 738 (2002). Notably, the coerciveness of the interrogation was not obvious to Ciria's lawyer, who had access to the entire transcript of Varela's interrogation—including all of the exchanges that the court today uses to decide that "Varela, scared by the threat of serious criminal liability, was adopting the story Defendants fed him"—but concluded that it would not be helpful to present any of it to the jury at Ciria's criminal trial.

The officers did not use or threaten to use physical force against Varela, and their statements reflected standard interrogation methods. The officers' observation that someone who drove a shooter to a crime scene might be subject to prosecution either as a principal or an accessory was an accurate statement of the law. *See People v. Jennings*, 237 P.3d 474, 513 (Cal. 2010). Their statement that Varela matched the description of the driver given by an eyewitness was an accurate statement of the facts. And their explanation of Varela's potential criminal liability was a tactic that this

court has repeatedly approved. *See, e.g.*, *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) ("Officers are allowed to recite the sentence a suspect may receive if found guilty."); *United States v. Bautista-Avila*, 6 F.3d 1360, 1364–65 (9th Cir. 1993) (same); *cf. Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (approving of interrogation in which officer told suspect, "[w]e can forgive your lies, but the United States Court system will not forgive your lies"), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc).

To recognize that the officers lacked fair notice that their interrogation methods violated Ciria's constitutional rights, we need not revisit the district court's factual determinations. In particular, the district court's characterization of the officer's conduct as "feeding [Varela] the story he needed to tell to avoid" a murder charge is not a factual determination, which we would lack jurisdiction to review. Rather, it is a legal conclusion—one that we review de novo—about the coerciveness of the officer's interrogation tactics.

Ciria emphasizes a statement Varela made partway through the interrogation: "I didn't know what was going to happen. I didn't know what was going to—Hey, whatever you said." That statement is ambiguous, but construing it in the light most favorable to Ciria, as we must, it supports an inference that Valera was merely adopting the officer's version of events. I agree that if Valera had been coerced into giving a false statement implicating Ciria, that would violate the Fourteenth Amendment. But whether Valera was coerced into adopting the story fed to him by police depends on the interrogation tactics that preceded Valera's admission. To prevail, he needs to show that those tactics were unconstitutionally coercive.

Even if, under the totality of the circumstances, the officers' questioning of Varela crossed the boundary into unlawful conduct, no case law in 1990 would have put the officers on notice that their interrogation tactics would amount to fabrication of evidence in violation of the Due Process Clause. To be sure, our decision in *Devereaux* makes clear that, as of 1990, "there [was] a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." 263 F.3d at 1074–75. The court today reasons that "a necessary corollary to this general prohibition" is that officers "could not use coercive and abusive interrogation tactics to get a witness to adopt a story they knew or should have known was fabricated." But clearly established law is not evaluated based on "general proposition[s]." *Saucier*, 533 U.S. at 201. Instead, Ciria must identify a decided case that would have put the officers on notice that their specific conduct amounted to tactics so coercive and abusive that they should have known the interrogation would produce false information. Specificity is important because "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine"—here, the due-process prohibition on using coercive or abusive tactics to obtain false information in an interrogation—"will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Saucier*, 533 U.S. at 205).

*Devereaux* did not provide such specificity because, as already noted, it was not decided until years after Varela's interview. The same is true of *Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir. 2013), on which Ciria relies. And the handful of other cases identified by Ciria do not do the job either.

In *United States v. Tingle*, for example, a federal agent interrogated a criminal defendant and told her that she would not see her two-year-old child "for a while if she went to prison." 658 F.2d 1332, 1334 (9th Cir. 1981). In addressing a Fifth Amendment claim brought by the defendant, we stated that "a confession 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id.* at 1335 (quoting *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)). And considering the "cumulative effect" of the coercive tactics employed by the agent, *id.* at 1336 n.4, we concluded that the defendant had been subjected to a form of "psychological coercion generated by concern for a loved one [that] could impair a suspect's capacity for self control," *id.* at 1336 (quoting *United States v. McShane*, 462 F.2d 5, 7 (9th Cir. 1972)). The case involved much more than an implicit threat of prosecution, and it did not involve a claim of fabrication of evidence through coercive interrogation of a third party.

Similarly unhelpful is *Pyle v. Kansas*, 317 U.S. 213 (1942). There, a state habeas petitioner submitted evidence of perjured testimony knowingly used by the State to convict him, including one witness who had previously been committed to a mental institution and who was threatened with prosecution if he did not testify for the State. *Id.* at 214. The Supreme Court determined that the petitioner's allegations "sufficiently charge a deprivation of [constitutional] rights." *Id.* at 216. But *Pyle* arose in the context of perjured testimony used by prosecutors at trial. It did not provide guidance on whether the threat of prosecution would be a coercive and abusive technique that yields false information during police interrogations. And the opinion in *Pyle* provided no details about how exactly

the State threatened the witness, so it would not have allowed the officers here to assess whether their conduct was impermissible. *See id.* at 214 (describing the petitioner's allegations as "crude").

Ciria cites no other examples of cases that might have told the officers that their exchange with Varela—explaining the law of accomplice liability, detailing the consequences of an adult murder charge, and cautioning Varela that eyewitnesses saw the driver—could support a claim of a deliberate fabrication of evidence. For that reason, the officers are entitled to qualified immunity.

## II

Ciria's malicious-prosecution claim fails for similar reasons. A necessary element of a malicious-prosecution claim is lack of probable cause. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). Even assuming that Ciria has adequately alleged that the defendant officers lacked probable cause to charge him with murder, he cannot overcome qualified immunity because it was at least "reasonably arguable" that probable cause existed. *Johnson v. Barr*, 79 F.4th 996, 1005 (9th Cir. 2023).

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). It "is not a high bar." *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Here, it is undisputed that Ciria fit the general physical description of the shooter offered by eyewitnesses, that he was previously involved in narcotics dealing with the victim, that the two had had a falling out and one of Ciria's friends had been murdered just the night before, that Ciria was with Varela—who was

placed at the scene of the murder—earlier that night, and that Ciria had a criminal record. On those facts, it is at least reasonably arguable that a reasonable officer would have thought there was a "fair probability" that Ciria was the shooter. *Gates*, 462 U.S. at 238.

To be sure, some of our pre-1990 cases stated that probable cause cannot be established through gossip and rumor or mere resemblance to a general physical description. *See*, *e.g.*, *United States v. Pinion*, 800 F.2d 976, 979 (9th Cir. 1986) (resemblance); *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (rumors). But the Supreme Court has held that "[i]t is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. Thus, a "robust consensus of cases . . . finding a Fourth Amendment violation 'under similar circumstances'" is usually necessary to "place the lawfulness of a particular arrest 'beyond debate.'" *Id.* at 65 (first quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam); and then quoting *al-Kidd*, 563 U.S. at 741).

Ciria has identified no authority that, in 1990, would have put the defendant officers on notice that they lacked probable cause under these specific circumstances. *McKenzie*, for example, involved significantly weaker evidence than is present here. In that case, the defendants, both jewelry salesmen, possessed three items of jewelry resembling "general inventory descriptions" of jewelry stolen in an earlier robbery-homicide. 738 F.2d at 1009. One defendant also had "some similarity" to a description of the suspect, but the eyewitness who had provided that description stated that the defendant was *not* the person he had observed. *Id.* at 1008–09.

The other cases on which Ciria relies addressed discrete categories of evidence in isolation—such as resemblance to a general physical description or uncorroborated rumor—rather than the cumulative effect of multiple pieces of inculpatory evidence considered together. But "this sort of divide-and-conquer analysis" is antithetical to the totality-of-the-circumstances approach that is key to the probable-cause inquiry. *Wesby*, 583 U.S. at 61 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). More importantly, overcoming qualified immunity requires a much closer factual correspondence: Existing precedent must have placed the unlawfulness of the officers' conduct "beyond debate" under the particular circumstances they confronted. *Id.* at 63 (quoting *al-Kidd*, 563 U.S. at 741). No such case did so here. Nor is this "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 65 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

I would reverse the district court's denial of qualified immunity to defendants on both claims.